2014 VT 9

## James Lathrop v. Town of Monkton

## Peter M. Norris, Sr. v. Town of Monkton

[91 A.3d 378]

Nos. 13-026, 13-032 & 13-033

Present: Reiber, C.J., Skoglund, Robinson and Crawford, JJ., and Toor, Supr. J., Specially Assigned

Opinion Filed January 24, 2014

*James Lathrop*, Pro Se, Bristol, Plaintiff-Appellee (13-026).

*Adam L. Powers* of *Powers & Powers P.C.*, Middlebury, for Plaintiff-Appellee Norris (13-032 & 13-033).

*Charles L. Merriman* of *Tarrant, Gillies, Merriman & Richardson*, Montpelier, for Defendant-Appellant.

¶ 1. **Crawford, J.** The Town of Monkton brings this consolidated appeal from decisions of the state appraiser in three property tax cases challenging the Town's 2011 assessment. The state appraiser ruled that the Town had treated taxpayers inequitably by adding additional "home-site values" to undeveloped parcels that are subject to a permitted and recorded subdivision plan. The Town does not add this additional element of appraised value to other undeveloped parcels that may be eligible for subdivision without a permit due to their history or configuration. The Town argues that it acted fairly in applying different valuation methods to properties with different characteristics. From the Town's perspective, the appraised value of a parcel of land with a permit for more than one home should reflect this additional development value, and land that could be subdivided but is not the subject of a permit is not similarly situated for purposes of tax appraisal. We agree and reverse.

¶ 2. At issue is the manner in which the Town assesses land that has the potential for subdivision and further development. At the time relevant to this appeal, a property owner in Monkton could legally subdivide and convey a portion of his or her property if that property was (1) naturally divided by a road; (2) contained multiple contiguous lots created by deed prior to the introduction of zoning in 1978; or (3) had a subdivision permit from the Town's Development Review Board (DRB). Generally, the first two categories of property could be divided and conveyed without a subdivision permit obtained from the DRB.

¶ 3. For property tax purposes, property in the first two categories was assessed as having only one house site, with the

remainder of the land valued according to the Monkton land schedule. However, if a property owner obtained a DRB permit to subdivide his or her property into multiple residential lots, and recorded a subdivision survey plat with the town clerk, the Town assigned a house site value of $51,500 to each additional permitted lot. Each potential house site was deemed to be two acres. The Town assessed the remaining undeveloped acreage according to the land schedule.

¶ 4. In the three appeals consolidated here, taxpayers applied for and received approval from the Monkton DRB to subdivide their parcels into two or more residential lots, and recorded the subdivision plans for the approved developments in the town records. The Town assessed these parcels as containing multiple two-acre house sites and valued the remainder of the land according to the town land schedule. Each additional two-acre house site added $51,500 to the parcel's total assessed value, with some variation to reflect the quality of each lot.[1]

¶ 5. Taxpayers appealed their 2011 assessments to the Monkton Board of Civil Authority, which denied the appeals. Taxpayers then appealed to the state appraiser.

¶ 6. The state appraiser found that "[t]he Town assesses contiguous lots within parcels created prior to 1978, not created through the town's zoning and [DRB] process with mylar on file, as only having one house site." The appraiser further found that parcels containing contiguous lots created after 1978 through the Town's DRB process were considered to have multiple house sites.[2] The appraiser found that the Town's distinction between the two types of parcels was "arbitrary" and that the Town was "not treating all properties in Monkton fairly and equitably with other like properties." He therefore removed the assessments for the additional house sites in each case. The Town appeals the appraiser's decision, arguing that the appraiser erred in determining that taxpayers were treated inequitably compared with other similarly situated taxpayers in Monkton.

---

[1] Each house site is assigned a grade, and the standard house site value of $51,500 is multiplied by that grade to reach the assessed value. For example, a two-acre house site with a grade of 1.0 has a value of $51,500. A grade of 1.20 will result in a value of $61,800, and a grade of 0.75 will result in a value of $38,625.

[2] The appraiser further found that "[c]ontiguous lots created within a single parcel that were created post 1978 through the town's zoning and [DRB] process highest and best use as a subdivision is considered to have multiple house sites."

568

¶ 7. We review the state appraiser's findings of fact for clear error. *Barnett v. Town of Wolcott*, 2009 VT 32, ¶ 5, 185 Vt. 627, 970 A.2d 1281 (mem.). Our review of the appraiser's legal conclusions is nondeferential and plenary. *Id.*

¶ 8. ▆ As a threshold matter, the Town asks us to reverse the appraiser's decision in taxpayer Norris's case because the appraiser failed to sanction Norris for his refusal to produce requested documents and records prior to the hearing. The administrative rule governing tax appeals states that parties to a property tax appeal "shall have reasonable rights to discover all documents and records that are relevant to the issues raised by the appeal," and the appraiser "may enforce this rule by appropriate sanctions, including dismissal of the appeal." Prop. Valuation and Rev. § 12, 1 Code of Vt. Rules 10 061 003-5, available at http://www.lexisnexis.com/hottopics/codeofvtrules. Representing himself, taxpayer declined to provide the Town with any documents prior to the hearing on the grounds that those materials were all public records and were not required to be submitted in advance. This was an improper response to the Town's discovery request. Whether the documents that a party intends to use at the hearing are public records is irrelevant under the rule, which clearly states that parties are obligated to disclose "all" relevant documents and records. *Id.* It would have been appropriate for the appraiser to enforce the Town's right to discover the information upon which taxpayer intended to rely at trial through sanctions imposed on the noncompliant party.

¶ 9. ▆ However, we will not reverse the decision below on this basis. Discovery rulings are within the broad discretion of the appraiser, and discretionary rulings will not be disturbed by this Court absent a showing that discretion was abused or entirely withheld. *Record v. Kempe*, 2007 VT 39, ¶ 9, 182 Vt. 17, 928 A.2d 1199. The appraiser declined to dismiss the appeal, finding that the discovery violation could be cured by giving the Town time to submit appropriate responses and comments after the hearing. The Town provides no evidence to show that it was denied such an opportunity.

¶ 10. ▆ ▆ We therefore proceed to the merits. The U.S. and Vermont Constitutions and Vermont statutes governing taxation of real and personal property require that taxes be uniformly assessed, so that no taxpayer pays more than his or her fair share

of the tax burden. *Allen v. Town of W. Windsor*, 2004 VT 51, ¶ 2, 177 Vt. 1, 852 A.2d 627. To that end, properties must be listed at fair market value. *Id.*; 32 V.S.A. § 3481(1). Fair market value is based on the highest and best use of the property. *Zurn v. City of St. Albans*, 2009 VT 85, ¶ 8, 186 Vt. 575, 980 A.2d 795 (mem.). The Town is not required to treat an undivided parcel as one economic unit for appraisal purposes if the highest and best use of the property is as subdivided lots. *Barnett*, 2009 VT 32, ¶ 11. The development potential of property is an appropriate factor to consider in fixing appraised values. *Scott Constr., Inc. v. City of Newport Bd. of Civil Auth.*, 165 Vt. 232, 235, 683 A.2d 382, 383-84 (1996).

¶ 11. Taxpayers' position, accepted by the state appraiser, is that the Town's taxation scheme violates the Proportional Contribution Clause of the Vermont Constitution and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because similarly situated taxpayers — i.e., those who own parcels divided by roads or containing contiguous lots created by deed prior to 1978, and those whose land is subject to a subdivision permit — are treated differently.[3]

¶ 12. ■ The state and federal guarantees of equal treatment do not require identical treatment. As we have noted in the past, "[t]he constitutional requirement of proportional contributions for the support of the government was not intended to restrict the State to methods of taxation that operate equally upon all its inhabitants." *Clark v. City of Burlington*, 101 Vt. 391, 405, 143 A. 677, 682-83 (1928). "And, as far as classifications are concerned, our proportional contribution clause is the practical equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution." *In re Estate of Eddy*, 135 Vt. 468, 472, 380 A.2d 530, 534 (1977).

---

[3] Chapter 1, Article 9 of the Vermont Constitution states:

> That every member of society hath a right to be protected in the enjoyment of life, liberty, and property, and therefore is bound to contribute the member's proportion towards the expence of that protection, and yield personal service, when necessary, or an equivalent thereto . . . and previous to any law being made to raise a tax, the purpose for which it is to be raised ought to appear evident to the Legislature to be of more service to community than the money would be if not collected.

¶ 13.  ■  In order to be constitutionally valid, a legislative classification of taxpayers must "bear a reasonable relation to the purpose for which it is established" and must "be fairly and equitably applied among like classes of taxpayers." *In re Prop. of One Church St. City of Burlington*, 152 Vt. 260, 266, 565 A.2d 1349, 1352 (1989). With regard to the first requirement, if "any reasonable policy or purpose" for the classification exists, it will be upheld. *Id.* (quoting *Andrews v. Lathrop*, 132 Vt. 256, 259, 315 A.2d 860, 862 (1974)); see also *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336, 344 (1989) ("A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable.").

¶ 14.  ■  Here, it was the practice of the Town to treat parcels with subdivision permits differently from parcels that could be sold as subdivided lots but are not subject to the DRB permit process. The Town had a reasonable purpose for doing so. While all three types of parcels may legally be sold as subdivided lots, a DRB permit operates as prima facie evidence that the highest and best use for the permitted parcel is to subdivide it into multiple home sites. The Town may rationally conclude on the basis of the permit that a permitted development is financially feasible and will result in the highest value for the land through sales of multiple home sites.

¶ 15. Parcels divided by a road or containing contiguous lots created by deed prior to 1978, by contrast, differ in important respects from parcels subject to a DRB permit. The fact that the owners in the first category have the right to sell their land as multiple lots without obtaining subdivision approval does not necessarily demonstrate that the highest and best use of their property is as multiple house sites. Subdivision of these types of parcels into multiple house sites has not been shown to be physically possible, financially feasible, or likely to result in the highest value. The lots may be unbuildable due to wetland or ledge, or they may be too small or landlocked, preventing residential use. On the other hand, after a taxpayer has gone through the effort of obtaining a permit and recording a subdivision plat, the Town may reasonably conclude that the highest and best use of that land is as a subdivision containing multiple house sites and assess it accordingly.

¶ 16. ■ The practice of adding the additional home-site value to permitted lots is only the starting point for the determination of appraised values. In determining the value associated with highest and best use, the Town may increase the value of an undeveloped parcel to reflect development value even in the absence of a DRB permit. See *Hurlburt v. Town of Monkton*, No. 2010-036, 2010 WL 7799809, at *3 (Vt. Oct. 21, 2010) (unpub. mem.) ("[I]t is not unlawful to assess subdivided lots of a larger parcel separately if the highest and best use of the property is for potential development."), https://www.vermontjudiciary.org/LC/unpublishedeo.aspx. Similarly, a taxpayer who has obtained a DRB permit remains free to present evidence that the property lacks development potential despite the issuance of the permit.

¶ 17. ■ We conclude that the Town's practice of assigning additional home-site values to permitted subdivisions has a rational basis and is constitutionally valid. There is a sufficient difference between lots with actual permits in place and lots which are potentially subject to division without a permit to justify the different treatment by the Town. The state appraiser therefore erred in reducing the assessed value of taxpayers' land.

*Reversed and remanded for the amendment of the assessed values of taxpayers' land consistent with this opinion.*