*City of Burlington v. City of South Burlington.*, Nos. 937-9-14 Cncv, 1222-11-13 Cncv, 183-2-13 Cncv (Toor, J., March 3, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

CITY OF BURLINGTON,
  Appellant

v.

CITY OF SOUTH BURLINGTON,
  Appellee

Docket Nos. 937-9-14 Cncv
1222-11-13 Cncv
183-2-13 Cncv

RULING ON MOTIONS FOR SUMMARY JUDGMENT

This is a tax appeal involving the taxability and valuation of municipally-owned property located in another municipality. Specifically, the case involves Burlington International Airport, which is owned by the City of Burlington but located in the City of South Burlington. Burlington appeals the decision of the South Burlington Board of Civil Authority as to the value of certain airport properties as provided on the 2012, 2013, and 2014 Grand Lists.[1] There are two categories of property at issue: areas leased to other entities, and areas purchased pursuant to the airport's Noise Compatibility Program. Both parties have moved for partial summary judgment. For purposes of clarity, the court refers to Burlington as "Taxpayer" and South Burlington as "the City," except in citations.

FACTS

Unless noted otherwise, the following facts are not genuinely disputed.[2] This tax appeal involves real estate located in the City but owned by Taxpayer. *See* Burlington's Statement of

---

[1] Each docket number refers to a separate grand list appeal.

[2] Taxpayer states that solely for the purposes of its own motion for partial summary judgment, it adopts the City's version of any and all facts that the City attempts to dispute with admissible evidence. *See* Burlington's Reply Mem. of Law in Further Support of its Motion for Partial Summ. J. (Burlington's Reply) (Sept. 18, 2015) at 1.

Undisputed Material Facts ("SMF") ¶ 2 (July 15, 2015). The real estate under appeal includes a large tract of 882.6 acres, which includes Burlington International Airport and land devoted to its operation. *See* id. ¶ 7; South Burlington's SMF ¶ 2. Although the parties contest whether the real estate functions as multiple parcels or as a single, larger parcel for appraisal and taxation purposes, it is not disputed that Taxpayer acquired the real estate piece by piece over the years, beginning in 1921. South Burlington's SMF ¶¶ 1, 3; Burlington's Resp. to South Burlington's SMF ("Burlington's Resp.") ¶¶ 1, 3; Ex. CC to Burlington's Resp. (airport property map and list); Ex. DD (Aff. of George Silver ¶ 7).

The amount Taxpayer paid the City annually for the airport real estate, as either ad valorem property taxes or payment in lieu of taxes, was formerly determined by agreement between the municipalities. *See* Burlington's SMF ¶ 20; Ex. F (tax stabilization agreement). This dispute arose when, starting with the 2012 tax year, the assessed value of what the parties refer to as the "main airport site" or "main airport parcel" (Parcel ID #: 2000-00000.001; also identified as 1200 Airport Drive # 1), as reported in the City's grand list, increased from $22,847,300 to $47,015,700, a difference of $24,168,400. *See* Ex. I. According to the South Burlington Board of Civil Authority's most recent decision, the total assessed value of all of Taxpayer's real estate located in the City is $75,668,700. *See* Decision of Board of Civil Authority (Aug. 28, 2014) (filed with court Dec. 14, 2015). To highlight the disparity between the parties, Taxpayer claims that the total grand list value determined by the Board of Civil Authority is incorrect, and that the correct "equalized market value" for all of its property in the City for ad valorem tax purposes is $7 million. *See* Ex. EE (Appraisal of George Silver); *see also* Ex. 6 to South Burlington's SMF (Burlington's Answers to South Burlington's Interrogatories) at 3.

Taxpayer acquired at least 130.2 acres that make up the airport property in conformity with 5 V.S.A. §§ 751–753. *See* Burlington's SMF ¶ 8; Ex. E and F.[3] Those statutes provide for state matching funds for the acquisition of property to be used for airport development, and are a prerequisite to the application of the taxation scheme provided in 5 V.S.A. § 754. Taxpayer has submitted evidence that land acquired since the enactment of the predecessors to sections 751–753 pursuant to its Airport Improvement Program (AIP program) has been funded with a combination of federal, state, and local dollars. *See* Burlington's Resp. to South Burlington's Statement of Additional Facts ¶ A; Ex. H (Aff. of Robert McEwing ¶ 11). The parties dispute whether § 754 is applicable to airport property acquired with any federal funds, a purely legal question which will be addressed below.

A number of improvements on the airport property are leased by Taxpayer to third parties, and have been set in the grand list by the City as taxable:

(a) 15 Eagle Drive (facility where Pratt & Whitney performs engine services on aircraft, including general aviation, commercial, charter, and fractional ownership aircraft, whose owners/pilots visit the facility for maintenance, repair, or engine refurbishment);

(b) 73 Customs Drive (FedEx facility which provides air shipping of packages for customers);

(c) 1120 Airport Drive ("South Hangar" and "T-Hangars") (provides leasing of aircraft storage space to private aircraft owners);

(d) 1130 Airport Drive (former terminal building);[4] and

(e) 1150 Airport Drive ("North Hangar") (providing rental of hangar space to private aircraft owners and rental of office space to commercial tenants, including a fishing equipment manufacturer and two general contractors).

---

[3] The City's objection to and denial of this fact is addressed later in the decision.

[4] The City is not seeking partial summary judgment as to whether it properly treated 1130 Airport Drive as taxable.

*See* South Burlington's SMF ¶¶ 7–12.[5] Taxpayer has not conducted a separate appraisal of any of those improvements. Id. ¶ 8.[6] For the tax years in question, the City has not assessed taxes on certain improvements at the airport, including the airport terminal, control tower, parking garage, and the Heritage Aviation fixed based operator facilities at 228 and 265 Airport Drive. Id. ¶ 6.[7] Burlington Community Development Corporation (BCDC), not the City of Burlington, is the owner of the improvements/building located at 265 Aviation Avenue. *See* South Burlington's Statement of Additional Facts ¶ C. BCDC is a non-profit corporation that is a separate entity from Taxpayer. Id. ¶ D. In the lease agreements by which Taxpayer leases land to the Burlington Community Development Corporation (BCDC) (which subleases to Heritage Aviation, Inc.), Federal Express, Pratt & Whitney, and SASO (Continental Express), Taxpayer and each lessee agreed that the lessee would pay real estate taxes as may be applicable to the leased premises. Id. ¶ E.

The airport is a Federal Aviation Administration (FAA) Part 139 certified airport and is classified as a primary small hub airport in the National Plan for Integrated Airport Systems. Burlington's SMF ¶ 9. As such, it is eligible to receive federal grant funds for capital improvements

---

[5] The parties dispute whether the uses of these private leaseholds are primarily "public," which appears to be a mixed question of law and fact. The court addresses that dispute later in the decision. The parenthetical information provided in the above list is for background purposes.

[6] The City alleges that Taxpayer has "no evidence to contradict the values set in the grand list" for the listed improvements. Taxpayer concedes only that it has not undertaken separate appraisals of those improvements, and contends that it does not have the burden to prove that taxation of the improvements is improper, and that the improvements are not taxable under 32 V.S.A. § 3659 as a matter of law. *See* Burlington's Resp. to South Burlington's SMF ¶ 8.

[7] Taxpayer claims that the City has, in fact, taxed "some of Heritages's FBO facilities." *See* Burlington's Resp. ¶ 6. However, to support this contention, Taxpayer cites only to paragraphs 11 and 12 of its Response, which do not indicate that the Heritage Aviation fixed base operator facilities located at 228 and 265 Airport Drive were taxed. Thus, the City's fact is deemed admitted.

and land acquisitions, including former residential properties in furtherance of its FAA-approved Noise Compatibility Program (NCP). Id.

Beginning in 1992 and as of April 1, 2012, Taxpayer purchased approximately 121 residential properties[8] located west of Airport Drive with federal grant funds under the Noise Compatibility Program. *See* South Burlington's SMF ¶¶ 14–15. The program provides for the voluntary sale of residential homes located within a certain day-night average ("dnl") noise contour of the airport. *See* id. ¶ 15. Some of the homes acquired were located within the 70 dnl noise contour, while some were within the 65 dnl noise contour. Id. ¶ 16. All or substantially all of the residential properties had homes on them at the time Taxpayer acquired them. *See* id. ¶ 18. To purchase property under the Noise Compatibility Program, a requirement is that "[e]ligible property owners will be paid fair market value for their property at its highest and best rate, and provided relocation assistance in accordance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 . . . ." *See* id. ¶ 17; Burlington's Resp. ¶ 18; Ex. 13 (June 19, 2008 FAA Record of Approval for Recommended Noise Compatibility Program Revision). The highest and best use determined by Taxpayer's appraiser, George Silver, for purposes of setting the fair market value and purchase price of residential properties acquired under the Noise Compatibility Program, was "residential use" when considered either as vacant land or as improved. *See* South Burlington's SMF ¶ 19.[9]

---

[8] The residential properties are also referred to throughout this decision as "noise lots."

[9] Taxpayer disputes this fact as incomplete, noting that the appraisals are "required to be performed and reviewed in connection with Taxpayer's NCP in order to establish an appropriate purchase price for those properties." Burlington's Resp. ¶ 19. Taxpayer also adds that those appraisals "presume a hypothetical condition that the presence of the Airport does not influence the market value of those properties and that the Airport was not proposing any changes or expansion of its current operation. Under those hypothetical conditions, it is appropriate to conclude that their highest and best use was for residential use." Id. (citing Ex. KK (Aff. of George Silver) ¶¶ 4–6). The court addresses the admissibility of the Silver affidavit supporting that hypothetical condition later in this decision.

5

As of April 1, 2012, of the approximately 121 residential properties acquired by Taxpayer under the Noise Compatibility Program, about 55 still contained houses, while 66 had been demolished or moved off site. South Burlington's SMF ¶ 20. Because the residential properties were acquired with FAA grant funds, Taxpayer is obligated to honor certain grant assurances with respect to those properties. *See* id. ¶ 21; Burlington's SMF ¶ 10. For instance, any attempt by Taxpayer to dispose of such land must "ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport." Burlington's SMF ¶ 12; Ex. G at 10. That assurance provides:

> 21. Compatible Land Use. [Burlington] will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

South Burlington's SMF ¶ 22; Ex. 16. Although the FAA grant assurances do not strictly prohibit residential use of the noise lots, Taxpayer states it would not be financially feasible for it to now allow residential development or use of those properties, because it would have to repay all its federal grant funds. *See* id. ¶ 23; Burlington's Resp. ¶ 23.

Many single and multi-family residential properties within the 65 dnl noise contour remain owned and occupied by persons other than Taxpayer. Id. ¶ 24.[10] Homeowners who sell to Taxpayer are permitted to remain in their homes for 90 days after closing. Id. ¶ 25. All of the residential

---

[10] In paragraph 24 of the City's statement of facts, undisputed by Taxpayer, the City refers to a "65 dB contour." The court assumes the City meant to refer to "dnl" rather than "dB," as it referred to "dnl" earlier in its facts in describing the day-night average noise contour within which residential properties acquired under the Noise Compatibility Program were located.

properties are located within the City's Residential 4 ("R4") zoning district. Id. ¶ 26. According to South Burlington Land Development Regulations, permitted uses within the R4 district are residential, places of worship, and in-home day cares. Id. ¶ 27. Permitted conditional uses include assisted living, education, and bed & breakfast. Id.[11] Deeds for the conveyance of residential properties to Taxpayer include no use restrictions. Id. ¶ 28. Taxpayer has not conveyed title or an interest in any of the residential properties to another party. Id. ¶ 29.

As a recipient of federal funds, the airport must comply with additional FAA Airport Grant Assurances, which require that Taxpayer

a. Make the airport available for public use on reasonable terms and without unjust discrimination;
b. Maintain a fee and rental structure for facilities and services which will make the airport as self-sustaining as possible; and
c. Ensure that all revenues generated by the airport will be used only for:
  i. Capital and operating costs at the airport;
  ii. The local airport system;
  iii. Other local facilities owned by Burlington directly and substantially related to the actual air transportation of passengers or property; and
  iv. For noise mitigation purposes on or off the airport.

Burlington's SMF ¶ 10; Ex. H and G. Taxpayer must reinvest any net revenue back into the airport and cannot divert any such revenue into Taxpayer's general municipal fund to pay for non-airport governmental services. *See* Burlington's SMF ¶ 13; Ex. D, G, and H. In the fiscal year ending June 30, 2010, the airport operated at a loss of more than $1.3 million. *See* Burlington's SMF ¶ 14; Ex. C.

The grant assurances further obligate Taxpayer to "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes

---

[11] The parties dispute whether the regulations prohibit "all other uses in the R4 district." *See* South Burlington's SMF ¶ 27; Burlington's Resp. ¶ 27. This is addressed later in the decision.

of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." Burlington's SMF ¶ 15. Taxpayer must also make available without charge to the federal government airport facilities "developed with federal financial assistance" and "all those usable for landing and takeoff of aircraft." Id. ¶ 16. The airport is open to "anyone and everyone" who wishes to travel or ship cargo by air. Id. ¶ 17. Taxpayer does not discriminate amongst potential airport tenants. Id. ¶ 19.[12] The parties dispute whether all of the airport tenants provide "services that are reasonably necessary or essential to the efficient operation and maintenance of the airport," and the City objects to the alleged "conclusory statement" supporting that point by Robert McEwing, the former Director of Planning and Development at the airport. Id. ¶ 18; South Burlington's Resp. ¶ 18. This goes to the public use issue, which will be addressed later in the decision.

In valuing the airport property, the City's expert witness Michael A. Hodges applied different appraisal methods to two different parts of the property. This resulted in a per acre value for the part denoted as "Area 2" that is five times the per acre value of "Area 1." "Area 1" consists of the "main airport site" or almost 98% of the total acreage, while "Area 2" consists of "developed private leaseholds for commercial aeronautical uses." Burlington's SMF ¶¶ 22–23; South Burlington's Resp. ¶¶ 22–23. Hodges points to no difference in topographical features between Area 1 and Area 2 that would explain the difference in value. Burlington's SMF ¶ 24. Instead, he justifies treating the two areas differently because of the existence of commercial leases for Area 2 and the designation of the area for commercial aviation uses. Id. ¶ 25. The rental data relied upon by Hodges for his Area 2 value assumes that a tenant would pay $0.35 per square foot per year. Id. ¶ 26. In his original report, Hodges included the noise lots in Area 1 along with the main airport

_____

[12] The City's affidavit supporting its denial of this fact contains inadmissible hearsay. *See* South Burlington's Resp. ¶ 19;Ex. 21 ¶¶ 6–7.

8

parcel, but a supplemental report excluded the 26.45 acres of the noise lots from that analysis because he was requested to do so by the City's attorneys. Id. ¶¶ 27–28; South Burlington's Resp. ¶ 27. Contrary to Hodges' original report, South Burlington Assessor R. Todd LeBlanc claims that the noise lots should continue to be assessed as residential. Burlington's SMF ¶ 29. LeBlanc opined that soundproofing, as an alternative to removal of the structures, could possibly be implemented on the existing houses on the noise lots to comply with the Noise Compatibility Program. Id. ¶ 30; South Burlington's Resp. ¶ 30.

In the value opinion upon which Taxpayer relies in this case, appraiser George Silver determined that the highest and best use of all the land he appraised is "industrial[,] commercial[,] or transportation development." South Burlington's SMF ¶ 30. Mr. Silver's analysis of the residential properties is based on his treating all the land of such properties as if they were undeveloped and part of the main airport parcel. Id. ¶ 31. The only evidence Taxpayer adduced as to value of the residential properties is the appraisal performed by Mr. Silver, which contains no information as to what residential acreage is worth in the City and no information as to the value of the improvements located on close to half the residential properties as of the valuation date April 1, 2012. Id. ¶ 32. According to the City's Assessor, residential property in the City has a typical value of $280,000 per acre, although Taxpayer contends that the City's Assessor has no evidence of that value other than the airport's purchases of properties pursuant to the Noise Compatibility Program. Id. ¶ 33; Burlington's Resp. ¶ 33. Appraised fair market values at the time of Taxpayer's acquisition of each of the residential properties, and the purchase prices paid by Taxpayer for them, are set forth in Taxpayer's discovery responses. See South Burlington's SMF ¶ 34; Ex. 20.[13]

---

[13] Taxpayer claims that the fair market value listed in those discovery responses "is based upon a hypothetical condition that the Airport is not adjacent to the property." See Burlington's Resp. ¶ 34; see also id. ¶¶ 17, 19. This is addressed later in the decision.

9

There is no other single landholding "similar" to Burlington International Airport in the City. *See* South Burlington's Statement of Additional Facts ¶ B; Burlington's Resp. ¶ B.

## SUMMARY OF THE ISSUES

The legal dispute in these consolidated cases involves the application of Vermont taxation statutes. These are 32 V.S.A. § 3659, which addresses the taxation of municipally-owned extraterritorial property, and 5 V.S.A. §§ 751–754, which deal more specifically with the taxation of airports located in one municipality and owned by another, and situated on land acquired with certain state financing. Both parties have moved for partial summary judgment.

## DISCUSSION

### I. Burden of Proof

The parties disagree about who bears the burden of proof, each arguing that it rests on the other. The question here is complicated by the fact that the disputes include both (1) what tax statute applies, and (2) how valuation is to be calculated under the statutes.

The standard rule as to valuation is as follows:

> The burden of proving the illegality of an assessment is on the one who contests its validity, generally the taxpayer, and it is incumbent upon the taxpayer to sustain his or her contentions by adequate proof. Whether property has been overvalued for property tax assessment purposes is a question of fact for the trier of fact.

16 McQuillin Mun. Corp. § 44:162 (3d ed.). Vermont law is consistent with this general proposition. In tax appeals pursuant to 32 V.S.A. § 4467, "[t]he burden of persuading the trier of fact that his property is over-assessed, which is the underlying issue, remains with the taxpayer throughout the entire proceeding." Dewey v. Town of Waitsfield, 2008 VT 41, ¶ 2, 184 Vt. 92 (2008) (quoting Kruse v. Town of Westford, 145 Vt. 368, 372 (1985)); *see also* Alison v. Town of Rochester, 150 Vt. 525, 527 (1988); Elliott v. Town of Barnard, 153 Vt. 306, 311 (1989).

10

Likewise, where a taxpayer claims an exemption, "[t]he burden of proof is upon the one who claims exemption." 16 McQuillin Mun. Corp. § 44:115 (3d ed.); *see also* Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 14, 178 Vt. 35 ("in construing tax exemptions, the burden is on the person claiming the benefit of the exemption . . . and the exemption statute must be strictly construed against that person") (citing In re Aloha Found., Inc., 134 Vt. 239, 240 (1976); In re Abbey Church, 145 Vt. 227, 229 (1984)). "This same principle is applicable to those seeking preferential tax classification," in addition to those seeking a total exemption. Estell Manor City v. Stern, 14 N.J. Tax 394, 416 (1995) (citing MacMillan v. Taxation Div. Director, 180 N.J. Super. 175 (App. Div. 1981)); *see also* Gramercy N. Associates v. Biderman, 573 N.Y.S.2d 491, 494 (App. Div. 1st Dep't 1991) (taxpayer has the burden of proof when seeking partial tax exemption).

The reason for this is that "[i]t is the general policy of the law to make all taxable property share the common burden of taxation." 71 Am. Jur. 2d State and Local Taxation § 207. Thus, tax exemption is considered a "privilege," is "never presumed," and such property "must clearly fall within the boundaries of the provision granting the exemption." 16 McQuillin Mun. Corp. § 44:80 (3d ed.).

The question becomes more complicated in a case such as this, however. "[T]he rule has also been stated that where state policy is to exempt property, the burden is on the taxing authority to establish taxability." Id. (citing Lehigh-Northampton Airport Authority v. Lehigh County Bd. of Assessment Appeals, 585 Pa. 657 (2005); In re Deromedi, 45 P.3d 1150 (Wyo. 2002); In re Town of Thermopolis From a Decision of State Board of Equalization—2000 Property Valuation (Town of Thermopolis, Parcel 2486-Old West Wax Museum), 45 P.3d 1155 (Wyo. 2002)); *cf.* 71 Am. Jur. 2d State and Local Taxation § 207 ("any claim for exemptions asserted by the owner,

*other than a public governmental body*, must rest upon some definite provision of law granting him or her a tax exemption") (emphasis added).

Muddying the waters further is the fact that this is municipally-owned property located in another town. In New England Power Co. v. Town of Barnet, the Supreme Court outlined the various types of burdens in "§ 4467 litigation," which it appeared to distinguish from "§ 3659 litigation." 134 Vt. 498, 507 (1976). The first is the standard tax appeal challenging valuation. 32 V.S.A. § 4467. The second involves the taxation of municipal property located in another town. 32 V.S.A. § 3659. The Court first observed that in Vill. of Morrisville Water & Light Dep't v. Town of Hyde Park, 131 Vt. 590 (1973) (Morrisville II), it had held that under section 3659, "the burden of proof in establishing substantial compliance with all statutory requirements resided with the taxing authority." New England Power, 134 Vt. at 507 (citing Morrisville II, 131 Vt. at 593). The Court then observed that in a more recent opinion it had noted that "§ 4467, unlike § 3659, deals with property normally subject to taxation, and we intimated that the burden of proof under section 4467 might be on the taxpayer rather than on the taxing authority." Id. (citing Vill. of Morrisville Water & Light Dep't v. Town of Hyde Park, 134 Vt. 325 (1976) (Morrisville III)). As the Court noted in Morrisville III, "§ 3659 deals with the taxation of property ordinarily exempt, while § 4467 deals with property normally subject to taxation." 134 Vt. at 328.

The New England Power Court then outlined several general principles applicable to tax appeals. The grand list value is presumed valid and legal. When the town introduces the appraisal of the taxpayer's property into evidence in section 4467 litigation, "the burden of going forward with the evidence to overcome the presumption [of validity] resides with the moving party." 134 Vt. at 507. That burden "is satisfied by the introduction of credible evidence fairly and reasonably tending to show that the property was assessed at more than fair market value or that the listed

12

value exceeded the percentage of listed value actually applied to the general mass of property in the community." Id. When such evidence is presented, the presumption disappears, and the town must then "meet its burden of justifying the appraisal by producing evidence demonstrating substantial compliance with constitutional and statutory provisions relative to uniformity as well as fair market value." Id. But, the Court cautioned: "It is to be emphasized, however, that the burden of persuasion as to the contested issues in a § 4467 hearing remains at all times with the taxpayer." Id. at 508; *see also* Beach Properties, Inc. v. Town of Ferrisburg, 161 Vt. 368, 375 (1994).

Taxpayer argues that the City has the burden of proof on establishing the airport's taxability and on all other contested issues. The City contends that Taxpayer, as the property owner, has the initial burden to prove that the parcels under appeal are subject to one of the special taxing statutes at issue here: (1) which, if any, parcels it acquired in conformity with 5 V.S.A. § 751–54 or its predecessor; and (2) which, if any, of the parcels and improvements it owns that are not subject to section 754 are devoted to a public use so as to be eligible for treatment under section 3659.

Taxpayer cites Morrisville II, 131 Vt. 590, 594 (1973), where a municipal water and light department challenged the validity of the property tax assessment of its property located in a different town. The municipal property owner argued that taxation of its property was governed by 32 V.S.A. § 3659. The trial court dismissed the case, concluding that the property owner had not shown it was entitled to relief under that statute, but the Supreme Court reversed, finding that that holding "incorrectly places the burden of proof on the plaintiff [property owner]." Id. at 594. However, that decision referred to the taxing authority's burden to justify its taxation after the property owner had already established the statute's applicability. "[P]laintiff had established that

13

the taxation of its land was governed by 32 V.S.A. § 3659 . . . ." Id. The property owner had the first burden, and the taxing authority the second.

Taxpayer offers two out of state citations in support of its argument that the taxing authority has the burden of proof on all issues here. *See* Norwegian Twp. v. Schuylkill Cty. Bd. of Assessment Appeals, 74 A.3d 1124, 1129–31 (Pa. Commw. Ct. 2013) (while taxpayer ordinarily has burden to establish tax exemption, "[t]he burden of proof of liability for taxes is on the taxing authority where the real estate in question is owned by a governmental body"); City of Cheyenne v. Bd. of Cty. Comm'rs of Laramie Cty., 484 P.2d 706, 709 (Wyo. 1971) (in declaratory judgment action by city against county involving status for tax purposes of buildings located upon municipally owned and operated airport, "[t]he burden is on the taxing authority to establish taxability"). In both cases, it was already established that the property was municipal and thus presumptively non-taxable. The burden of the taxing authority was to show that the use was non-public, an exception to the presumption of non-taxability. *See also* In re Deromedi, 45 P.3d 1150, 1153–54 (Wyo. 2002) (burden is on the taxing authority to establish taxability "where the established policy of the state is to exempt publicly owned property . . . ."); Lehigh-Northampton Airport Auth. v. Lehigh Cty. Bd. of Assessment Appeals, 585 Pa. 657, 669 (2005) (state and municipal property is presumptively immune from taxation and remains unaffected by local taxing power "absent express statutory authorization to the contrary").

Other jurisdictions have held that even when the taxpayer is a municipality, it has the burden of proof to establish a tax exemption. *See* Mikos v. City of Sarasota, 636 So. 2d 83, 85 (Fla. Dist. Ct. App. 1994) ("When a municipality claims an exemption, it has the burden to clearly show its entitlement to the exemption and any exemption must be construed against the property owner."); Westmarc Cablevision, Inc. v. Bair, No. 03-0667, 699 N.W.2d 684, *3 (Iowa Ct. App.

May 25, 2005) ("The party claiming the exemption, here [a municipal communications utility], has the burden to show that the property should not be taxed."); City of Lawrenceville v. Maxwell, 6 Ill. 2d 42, 49 (1955) (municipality, which claimed that its property was exempt from taxation, had burden of proving by competent evidence that the property was being used exclusively for municipal or public purposes).

The Vermont Supreme Court has remarked that it is "contrary to the policy of this State" to subject municipal property to taxation "absent the most positive legislative enactment." Swanton Village v. Town of Highgate, 131 Vt. 318, 322 (1973). Though the legislature has created such positive legislative enactments, *see*, *e.g.*, No. 38 of the Public Acts of 1912; 32 V.S.A. § 3659; 5 V.S.A. § 754, those exceptions do not change the general policy against taxation of municipal property. Other Vermont case law suggests, but does not definitively say, that Taxpayer has the burden of proof as to the applicability of a particular taxation statute. *See* Morrisville II, 131 Vt. at 594–95. Though section 3659 must be "strictly construed" against the taxing authority because it taxes property "otherwise exempt," Morrisville II, 131 Vt. at 593–94, the Supreme Court has never suggested that the taxing authority bears the burden to prove that a particular preferential tax statute applies to a municipal taxpayer.

The case law and authorities do not offer a clear answer. The court concludes that in applying the legal principles to the complicated situation here, the best way to articulate the burdens of proof in this case is as follows, from the most general to the most specific. First, the most general rule is that everyone is subject to taxation, because "[i]t is the general policy of the law to make all taxable property share the common burden of taxation." 71 Am. Jur. 2d State and Local Taxation § 207.

15

However, that rule is subject to another general policy that municipal property, put to a public use,[14] is not taxable. *See* Swanton, 131 Vt. at 322 (stating it is "contrary to the policy of this State" to subject municipal property to taxation "absent the most positive legislative enactment"); Morrisville III, 134 Vt. at 328 (describing municipally owned property as "property ordinarily exempt" from taxation); Morrisville II, 131 Vt. at 593–94 (section 3659 must be "strictly construed" against the taxing authority because it taxes property "otherwise exempt"). The taxpayer-municipality invoking this policy must prove that it is a municipality which owns the subject property, and that its property is put to a public use.[15] In this case, there is no dispute that Taxpayer is a municipality which owns the property in question; the only issue here is whether the property is put to a public use.[16] It would be nonsensical to make the taxing authority bear the burden here, as any taxpayer could then claim it is a municipality with land subject to public use, thus requiring the taxing authority to disprove those facts. Furthermore, the taxpayer, as property owner, would likely be in a much better position to produce evidence indicating how its own real estate is used. *Cf.* AIG Ins. Mgmt. Servs., Inc. v. Vermont Dep't of Taxes, 2015 VT 137, ¶ 18 n.2 (reasonable to place burden on business in tax appeal because "evidence relevant to a business's operations is uniquely available to that business"). If the taxpayer-municipality meets its burden

---

[14] The public use requirement is discussed in a later section of this decision.

[15] The court notes that the Pennsylvania and Wyoming cases cited by Taxpayer state that the taxing authority must show a non-public use to establish an exception from the general rule of immunity for municipal property. *See* Norwegian Twp., 74 A.3d at 1129–31; Lehigh-Northampton Airport Auth., 585 Pa. at 669; Deromedi, 45 P.3d at 1153–54; Cheyenne, 484 P.2d at 709. However, the court believes the accurate expression of that presumption under Vermont law is that it includes municipal property that is put to a public use. The mere fact that a property is municipally owned, without considering the use to which it is put, does not establish that presumption. The fact of municipal ownership and the fact of public use necessarily go together, and therefore must be established together, by the party invoking the presumption. Following the logic of the Pennsylvania and Wyoming cases cited above would artificially separate two required elements of the presumption against taxation for municipal public-use property.

[16] The court observes that in some cases, the taxpayer's status as a municipality may be at issue. *See*, *e.g.*, Int'l Water Co. v. Town of Holland, 161 Vt. 584, 585 (1993) (town's argument that taxpayer was a municipality "fails because there is no indication at all in the record that IWC is a municipality"). That is not the case here.

here, then the property is presumptively non-taxable. If not, the property is subject to full fair market value taxation.

Once a taxpayer establishes it is subject to the non-taxation presumption applicable to municipal "public use" property, the next question is whether that presumption goes away because of specific statutory provisions permitting taxation. In Vermont, section 3659 provides an exception to the general policy of non-taxation for municipal property put to a public use. That exception applies to municipal property located in another municipality. Because this statute taxes municipal property, "contrary to the policy of this State," Swanton, 131 Vt. at 322, the taxing authority bears the burden to prove that such property falls under section 3659. That is, the taxing authority must prove that the subject property is located within its own municipal limits. If it meets this burden, the "ordinarily exempt" property is taxable according to the formula in section 3659. If not, the property is not taxable. Here, there is no question that all the disputed real estate lies within the boundaries of the City.

However, a further exemption to the section 3659 exception exists in 5 V.S.A. § 754, and applies if the land was purchased in conformity with certain state financing as articulated by sections 751–753. The taxpayer invoking section 754 must prove that its property was acquired in conformance with sections 751–754. As with the public use requirement, it would make no practical sense to require the taxing authority to disprove the special financing of the property, because the property owner would naturally have more thorough and accurate records as to how it financed its purchase of the property. *Cf.* AIG, 2015 VT 137, ¶ 18 n.2. If the taxpayer meets its burden, the property is subject to more favorable tax treatment under section 754. If not, the property remains subject to section 3659 taxation.

Lastly, to the extent Taxpayer challenges the actual valuation of "public use" property as placed in the grand list, the taxing authority has the burden to show statutory compliance, including that the subject properties were taxed the same as "similar property" in the municipality under section 3659. *See* Morrisville III, 134 Vt. at 327. Thus, the City must show some evidence of the value of "similar property." If so, the presumption of validity for the listed value applies, and Taxpayer must come forward with its own evidence of value. *See* New England Power, 134 Vt. at 507–08. Assuming the case reaches that point, taxability would already have been established, and so the normal rules regarding tax appeals would apply. If Taxpayer challenges the grand list value of non-public use property, however, or property it owns that is otherwise not entitled to a presumption of non-taxability, then Taxpayer must present its own evidence of value as to those properties that is contrary to the grand list value. Id.

II.     General Rule of Construction for Municipal Taxation Statutes

In addition to the burden of proof, the parties also dispute the rule governing how to construe 5 V.S.A. § 754 and 32 V.S.A. § 3659. While Taxpayer argues these statutes should be strictly construed in favor of the taxpayer because they permit taxation of property normally exempt, the City argues the opposite.

In light of the above discussion regarding the burden of proof, only a brief analysis is necessary here. It is "contrary to the policy of this State" to subject municipal property to taxation "absent the most positive legislative enactment." Swanton, 131 Vt. at 322. Section 3659 must be "strictly construed" against the taxing authority because it taxes property "otherwise exempt," Morrisville II, 131 Vt. at 593–94, and there is no reason to think the same rule would not apply to section 754, another statute which taxes property otherwise exempt. The case law is clear. To the

extent that statutory construction is necessary, the court will apply that rule, rather than the rule that tax exemptions are strictly construed against the taxpayer.

### III.     Public Use Requirement

The City argues that both 5 V.S.A. § 754 and 32 V.S.A. § 3659 contain a public use requirement and that Taxpayer can only receive special tax treatment under those statutes if the property is primarily dedicated to a public use. Taxpayer contends that neither statute contains such a requirement, nor can it be implied through the legislative history or case law.

Section 754 provides:

> Title to land purchased in conformity with sections 751-753 of this title shall vest entirely in the state, jointly in the state and the local governmental units, or entirely in the local governmental units as in each case is most proper. Land so acquired shall not be taxable, but when the title vests in the state or when the title is held jointly by the state and a town or towns, and the site is located in a different town or when the title vests in one or more towns and the site exists in a different town, then the holders of the title shall make an annual payment, instead of taxes, to the town in which the site is located of a sum equal to the tax otherwise assessed on the land alone.

Section 3659 provides:

> Land and buildings of a municipal corporation, whether acquired by purchase or condemnation and situated outside of its territorial limits shall be taxed by the municipality in which such land is situated. Said land shall be set to such municipal corporation in the grand list of the town or city in which such real estate is located at the value fixed in the appraisal next preceding the date of acquisition of such property and taxed on such valuation. The value fixed on such property at each appraisal thereafter shall be the same per acre as the value fixed on similar property in the town or city. Improvements made subsequent to the acquisition of the land shall not be taxed; except that an additional tax not to exceed 75 percent of the appraisal of the land may be levied in lieu of a personal property tax. Electric utility poles, lines and pole fixtures owned by a municipal utility lying beyond its boundaries shall be taxed at appraisal value as defined in section 3481 of this title.

19

Neither statute contains an explicit public use requirement. Therefore, if such a requirement exists, it must be implicit, or derived from some source other than the plain statutory language. It is instructive to review the rules of statutory construction, which demonstrate that legislative intent may not necessarily be consistent with the literal meaning of the statutory language:

> When interpreting statutes, the bedrock rule of statutory construction is to determine and give effect to the intent of the Legislature. We effectuate this intent by first examining the plain meaning of the language used in light of the statute's legislative purpose. If that plain language resolves the conflict without doing violence to the legislative scheme, there is no need to go further. But if the literal meaning of the words is inconsistent with legislative intent, the intent must prevail. Such inconsistency occurs if applying the precise wording of a statute produces results which are manifestly unjust, absurd, unreasonable or unintended, or conflicts with other expressions of legislative intent. The legislative intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences. Finally, where there are similar statutes in other jurisdictions, we are also guided by the interpretations of those statutes.

Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129 (alterations in original) (quotations and citations omitted); *see also* In re Carroll, 2007 VT 19, ¶ 9, 181 Vt. 383 (noting that Vermont courts determine legislative intent by considering "the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law").

The City contends there is a "fundamental principle that a municipally owned improvement must be dedicated to a public use for limitations on taxation to apply." South Burlington's Mot. for Partial Summ. J. at 31. To support this proposition, it cites Int'l Water Co. v. Town of Holland, 161 Vt. 584, 585 (1993) (mem.) ("taxing power granted by § 3659 must be 'strictly construed' because it is contrary to policy of state to subject property *devoted to public use* to general property tax, absent 'the most positive legislative enactment'") (emphasis added) (quoting City of Montpelier v. Town of Berlin, 143 Vt. 291, 293 (1983)). Second, the City points the court to an

20

excerpt from an older case which, while it predates section 3659, offers a discussion of the basic

concept that municipal property must be dedicated to public use to qualify for special tax treatment:

> It has been repeatedly said in general discussions that property owned by municipal corporations cannot be taxed without express statutory authority, that the nature and purpose of taxation are such as preclude the idea of its being made a burden upon public property, and that tax laws will not be held applicable to municipal holdings unless the language positively requires it. These statements are doubtless made with reference to the general rule that a municipal corporation does not and cannot hold property except for public use. They certainly have failed to control when the courts have met with exceptional cases where the ownership was municipal, and the use distinctly private. . . . It is doubtless in recognition of this class of cases that most writers treat the rule as requiring not only municipal ownership, but appropriation to a public use. We are satisfied that under the doctrine of implied exemption, as applied to municipalities, the ultimate test is not municipal ownership, but public use, so that this doctrine gives the defendant no greater right than it has by our statute, and the question whether the use is public will be controlling under either branch of its claim.

Styles v. Vill. of Newport, 76 Vt. 154, 163–64 (1904). Finally, the City cites an A.L.R. annotation

indicating that courts have consistently denied tax exemptions for airport operations that serve

private aircraft. *See* James L. Buchwalter, When Is Property Owned by State or Local

Governmental Body Put to Public Use So As to Be Eligible for Property Tax Exemption, 114

A.L.R.5th 561, § 14(a), 14(b), 24(a), 24(b), 25 (originally published in 2003).

In arguing that there is no public use requirement, Taxpayer notes unsurprisingly that such

public use language is "glaringly absent" from both sections 751–754 and section 3659.

Burlington's Opp'n at 16. Taxpayer also argues that International Water, Styles, and 32 V.S.A. §

3802(4) (which dates back to the 1780s) make clear that the legislature knows how to explicitly

draft an exemption for public use, and that its failure to include such language in the later enacted

sections 751–754 and section 3659 demonstrates its intent to omit a public use requirement from

those statutes. Taxpayer further cites two out of state cases interpreting state provisions which are

21

silent on the public use issue. Finally, Taxpayer observes that a number of the cases listed in the City's A.L.R. citation are inapposite because they involve "tax exemption statutes with explicit use-type requirements," unlike sections 751–754 and 3659. *See* Burlington's Opp'n at 17–18.

The introduction to the annotation cited by the City provides that "[t]he annotation . . . does not encompass cases discussing only whether the property is in fact owned by a governmental body, or the *taxation of governmental property where there is no 'public use' requirement for gaining an exemption*." 114 A.L.R.5th 561, § 1(a) (emphasis added). The threshold question here is whether there is a public use requirement in the statutes, not, as is the focus of the annotation, "whether property owned by a state or local governmental body is being put to a 'public use,' or is used for a 'public purpose,' within the meaning of a constitutional or statutory exemption from real property 'ad valorem' taxation." Id.[17] While the annotation demonstrates that many other

---

[17] Thus, the cases cited in the annotation do not address whether a property tax exemption statute that is silent on the issue of public use contains an inherent or implicit public use requirement. Instead, they address whether the subject property satisfies a public use requirement that is explicit in the statutory or constitutional provision. For instance, City of Little Rock v. McIntosh, 319 Ark. 423 (1995) dealt with Ark. Const. art. XVI, § 5(b) ("The following property shall be exempt from taxation: public property used exclusively for public purposes"); Town of Harrison v. Westchester County, 13 N.Y.2d 258 (1963) involved N.Y. Real Prop. Tax Law § 406 (McKinney) ("Real property owned by a municipal corporation within its corporate limits held for a public use shall be exempt from taxation and exempt from special ad valorem levies and special assessments . . . ."); the Iowa Supreme Court decision in City of Osceola v. Board of Review of Clarke County, 490 N.W.2d 539 (Iowa 1992) focused on Iowa Code Ann. § 427.1 (West) ("The following classes of property shall not be taxed: . . . The property of a county, township, city, school corporation, levee district, drainage district . . . when devoted to public use and not held for pecuniary profit"); an Illinois appellate court in Du Page County Airport Authority v. Department of Revenue, 358 Ill. App. 3d 476 (2d Dist. 2005) addressed 35 Ill. Comp. Stat. Ann. 200/15-160 ("All property belonging to any Airport Authority and used for Airport Authority purposes . . . is exempt"); and a Florida appellate court decision, Greater Orlando Aviation Authority v. Crotty, 775 So. 2d 978 (Fla. Dist. Ct. App. 5th Dist. 2000), addressed the following state constitutional provision: Fla. Const. art. VII, § 3 ("All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation").

Only one case in the annotation might have construed a constitutional provision that was silent on the issue to require public use for a tax exemption on municipal property to apply. However, that case involved a former provision of the Florida Constitution that has since been amended or reorganized, and the exact language of that provision it is not clear from the case. *See* Hillsborough Cty. Aviation Auth. v. Walden, 210 So. 2d 193, 195 (Fla. 1968). Further, the Florida Constitution currently contains an express public use requirement. *See* Fla. Const. art. VII, § 3.

22

states have included a public use requirement in express statutory or constitutional provisions, that does not answer the question here. *See* id. §§ 14(a), 14(b), 24(a), 24(b), 25.

Styles also does not resolve the question. 76 Vt. at 163–64. While it states the general principle that municipally owned property is subject to tax exemption only if dedicated to a public use, and demonstrates that Vermont has recognized that principle, it also predates both 5 V.S.A. § 754 and 32 V.S.A. § 3659. It does not answer the question of what the legislature intended when the statutes were enacted.

The Supreme Court remarked in City of Montpelier v. Town of Berlin, 143 Vt. 291, 293 (1983)—later quoted in Int'l Water, 161 Vt. at 585—that the taxing power granted by section 3659 is to be "strictly construed, as '[i]t is contrary to the policy of this State to subject its own property or that of its municipalities, *which is devoted to a public use*, to a general property tax, absent the most positive legislative enactment.'" (quoting Swanton Village v. Town of Highgate, 131 Vt. 318, 322 (1973)) (emphasis added). In Swanton, from which the Court derived the "which is devoted to a public use" language, the Court outlined the legislative history of what became section 3659. That legislative history does not plainly indicate a public use requirement.[18] However, the public use requirement has been at least alluded to by the Supreme Court as a general principle, both before and after the enactment of the precursors to sections 754 and 3659. *See* Int'l Water Co., 161 Vt. at 585; City of Montpelier, 143 Vt. at 293; Swanton Village, 131 Vt. at 322;

_____

[18] Taxpayer claims that Swanton recognizes only that "municipally owned property is de facto devoted to a public use," and that the City's argument "fails as a matter of grammar." Burlington's Mot. for Partial Summ. J. at 15 n.4. Taxpayer observes that the phrase "which is devoted to a public use" is set off by commas, and that as a subordinate clause "it modifies the preceding noun, namely municipal property." Id. However, it is not clear the Supreme Court intended that meaning. One of the earlier cases cited in Swanton states the same public use principle, but without the comma: "[I]t is not the policy of the state to subject its own property, nor that of its municipalities which is devoted to a public use, to a general property tax." In re Downer's Estate, 101 Vt. 167, 174 (1928). Thus, it appears the extra comma was added inadvertently years later in Swanton.

In re Estate of Taft, 110 Vt. 266, 273 (1939); In re Downer's Estate, 101 Vt. 167, 174 (1928); Styles, 76 Vt. 154 (1904).

Nor do the two out of state cases cited by Taxpayer resolve the issue. *See* Town of Hanover v. City of Lebanon, 116 N.H. 264, 265 (1976) (holding that under a statutory amendment deleting the requirement of use for public purposes, an affirmative showing of public use is not required of a town seeking abatement of taxes on land properly owned by the town); Clark v. City of Tucson, 1 Ariz. App. 431, 433 (1965) (holding that under Arizona constitutional provision which does not contain any express limitations on tax exemption for public use, "property owned by a municipality is exempt from ad valorem taxes regardless of the use made of the property"). The New Hampshire case is inapposite. There, unlike here, the intent of the legislature was clear given the explicit statutory amendment *deleting* "public use" language. The Arizona case seems more on point in that it dealt with a constitutional tax exemption provision which was silent on the issue of public use, *see* Ariz. Const. art. IX, § 2 ("There shall be exempt from taxation all federal, state, county and municipal property"), though its analysis is limited. In that case, there was no indication that the constitutional provision, when enacted, had changed a previous common law rule as to public use requirements for tax exemptions. Though an earlier Arizona case had concluded that the legislature had the power under the constitution to provide for the assessment and taxation of private leasehold interests in municipal property, it also observed that "a careful examination of [Arizona] statutes from early territorial days to the present time" revealed "no specific reference to the taxation of leasehold interests of this nature." Maricopa Cty. v. Fox Riverside Theatre Corp., 57 Ariz. 407, 412 (1941).

While 32 V.S.A. § 3802(4) contains an explicit and total public use exemption under the default taxation scheme, and the predecessor to that statute dates back to the 1780s, *see*

MacDonough-Webster Lodge No. 26 v. Wells, 2003 VT 70, ¶ 12, 175 Vt. 382, the court deems that of limited relevance in light of the Supreme Court's subsequent recognition of the public use requirement as a general principle in 1904. *See* Styles, 76 Vt. at 163–64. The court further notes that "[g]enerally, . . . it is unrealistic to assume that a legislature has in mind all prior acts relating to the same subject whenever it enacts a new statute. The process of enactment may have considered some, but not all, related statutes." 2B Sutherland Statutory Construction § 51:1 (7th ed.).

In outlining the legislative history of sections 754 and 3659, Taxpayer claims that history indicates that the legislature had several opportunities to impose an express public use requirement onto those statutes, and did not do so. Indeed, Taxpayer contends, the legislature specifically rejected two proposed changes that would have done so.

Courts frequently rely upon legislative history where the meaning of a statute cannot be determined from the words alone. In re Dep't of Bldgs. & Gen. Servs., 2003 VT 92, ¶ 14, 176 Vt. 41. In doing so, however, courts "must be cognizant of the quality of the evidence of legislative intent." Id. For instance, "the remarks of a witness at a committee hearing are accorded little weight in determining the intent of the legislature in enacting a statute." State v. Madison, 163 Vt. 360, 373 (1995). Rather, legislative history is helpful only where it clearly shows the intent of the legislature. Id. at 374.

While the legislative history here shows a tortured history of changes and proposed changes to the precursor to 32 V.S.A. § 3659 between 1943 and 1949, s*ee* Burlington's SMF ¶¶ 42–55, none of the various proposals along the way included "public use" language, so the court can draw no clear conclusion from its mere omission. To similar effect is the legislative history of 5 V.S.A. § 754.

The appropriate analysis of the legislative history is whether the enactment of the statutes and their subsequent amendments effectively abrogated the common law as articulated in Styles by eliminating a public use requirement for tax exemption of municipally owned property. "The common law is changed by statute only if the statute overturns the common law in clear and unambiguous language, or if the statute is clearly inconsistent with the common law, or the statute attempts to cover the entire subject matter." Villeneuve v. Powers, 158 Vt. 330, 332 (1992) (quoting Langle v. Kurkul, 146 Vt. 513, 516 (1986)). Further, in construing a statute, courts "are not to presume that the [L]egislature intended to work any change in the common law beyond what the statute itself declares in either express terms, or by unmistakable implication." Id. (alteration in original) (quoting Record v. State Highway Board, 121 Vt. 230, 236–37 (1959)); *see also* E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 464 (1934) ("rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language").

The Vermont Supreme Court has repeatedly found that statutory enactments have not replaced the common law by implication. For example, in State v. Hazelton, 2006 VT 121, ¶¶ 29–31, 181 Vt. 118, the Court concluded that while 13 V.S.A. § 3251(3) did not explicitly exclude minors from entering into voluntary agreements to engage in sexual acts, it nonetheless did "not alter the common law making such consent by underage children a legal impossibility." Id. ¶ 29. The Court wrote:

> The statute simply fails to address the issue of a minor's legal capacity to consent, and the definition is not inconsistent with a minor's incapacity to consent under common law. Since enactment of this statutory scheme in 1977, this Court has continued to recognize the application of common law impossibility of consent by underage minors.

Id.

26

In Villeneuve, 158 Vt. 330, plaintiffs brought an action seeking damages for defendants' failure to remove a beaver dam on their adjoining property. Id. at 330. Although the trial court dismissed the action, concluding that plaintiffs' common law rights were abrogated by 10 V.S.A. App. § 43(e) and that plaintiffs were left to their statutory remedies, the Supreme Court reversed. The Court held that "there is nothing in the text of § 43(e) that denotes or implies abrogation of common-law actions, and we have no reason to assume that it overrode preexisting common-law rights." Id. at 332. "In sum, in the absence of statutory intent in § 43(e) to substitute an administrative permit process for existing common-law actions, the need for an administrative permit to remove a beaver dam did not by itself relieve defendants of whatever common-law duty they might have to plaintiffs with respect to the beaver dam on their property." Id. at 334.

Similarly, in In re Estate of Lamore, 2009 VT 114, ¶¶ 9–12, 187 Vt. 571, a probate statute did not expressly state what would happen if the "next of kin" ordinarily entitled to administration of an estate were a minor. The Court noted that, in this situation, "we fall back on the notion that ambiguous provisions 'do not change common law rules; the intent to do so must be expressed in clear and unambiguous language.'" Id. ¶ 9 (quoting Swett v. Haig's, Inc., 164 Vt. 1, 5 (1995)). Because, "as in Hazelton," the common law rule at issue in Lamore addressed an issue that the statute "simply fail[ed] to address" and was "not inconsistent with the statute," the Court applied the common law rule to interpret the statute and held that the minor's guardian would step into the shoes of the minor to administer the estate. Id. ¶11. The Court also noted that its holding was consistent with courts in other jurisdictions. Id. ¶¶ 10, 12.

Applying the factors from Villeneuve and Langle, the court concludes that the statutes here did not abrogate the common law. The statutes simply fail to explicitly address the public use requirement, and imposing such a requirement is not inconsistent with the statutes. Moreover, there

is nothing to suggest that these statutes were intended to restate every possible issue related to taxation of municipally owned property. *See* 15A Am. Jur. 2d Common Law § 15 (common law abrogated by statute where statute "revises the common law and is clearly designed as a substitute therefor" or "purports to be a revision of the whole subject," while "partial codification of a common-law rule does not necessarily abolish such portion of the rule not encompassed within the statute"); Langle, 146 Vt. at 517; Villeneuve, 158 Vt. at 332–33; Hazelton, 2006 VT 121, ¶ 36. This analysis comports with previous Vermont and out of state decisions, which have demonstrated reluctance to find that statutes changed the common law in similar situations. *See generally* 3 Sutherland Statutory Construction § 61:1 (7th ed.) ("Statutes which impose duties or burdens or establish rights or provide benefits not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation. Where there is any doubt about their meaning or intent they are given the effect which makes the least, rather than the most, change in the common law." 15A Am. Jur. 2d Common Law § 15 ("abrogation of common-law claims by legislative creation of a statutory remedy is disfavored").

In order for the taxation schemes under 5 V.S.A. § 754 and 32 V.S.A. § 3659 to apply, the municipally owned property must be put to public use. This conclusion is consistent with the obvious purpose behind such a public use requirement for municipal property, as well as a rational interpretation of the statutes. *See* Du Page Cty. Airport Auth. v. Dep't of Revenue, 358 Ill. App. 3d 476, 497 (2005) ("[d]eclaring all commercial and recreational uses, along with airport-related uses, to be tax exempt would . . . create a substantial tax loophole to be exploited by private lessees"); *see also* Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129 (court will not interpret statutes to produce absurd or unreasonable results).

IV.    Public Use Test as Applied to the Leased Lots

Vermont case law concerning the concept of "public use" generally addresses the explicit

tax exemption in 32 V.S.A. § 3802(4) for "[r]eal and personal estate . . . used for public, pious or

charitable uses." In determining whether the public use exemption applies, "the crucial factor is

the primary use to which the property is put." Am. Museum of Fly Fishing, Inc. v. Town of

Manchester, 151 Vt. 103, 108 (1989).[19] The Supreme Court has further explained:

> Before a property is entitled to tax-exempt status as a public use, it
> must meet certain criteria, as follows: (1) the property must be
> dedicated unconditionally to public use; (2) the primary use must
> directly benefit an indefinite class of persons who are part of the
> public, and must also confer a benefit on society as a result of the
> benefit conferred on the persons directly served; and (3) the property
> must be owned and operated on a not-for-profit basis. All of the
> above criteria are explicitly stated or are implicit in the prior
> decisions of this Court.

Id. at 110. In many out of state cases, the general rule is that "public property is exempt from

taxation if used for a predominantly public purpose and only incidentally for a private purpose."

114 A.L.R.5th 561. McQuillin has also explained:

> In determining whether or not property is used for a public purpose,
> the test appears to be whether it is used primarily for the health,
> comfort and welfare of the public. It is not essential that it be used
> for governmental purposes. It is sufficient if it is property which all
> of the public has a right to use under proper regulations. "Public
> purpose" contemplates that the use must be common to all and not
> a particular group.

16 McQuillin Mun. Corp. § 44:89 (3d ed.).

The parties here have not expressly articulated whether the three-factor legal standard from

Am. Museum of Fly Fishing should be utilized to decide whether the property is put to a "public

use." However, they both seem to agree that the determination is whether a property is primarily

---

[19] The City agrees that much of the airport property, such as the terminal, control tower, and parking garage, constitutes a non-taxable public use. South Burlington's Mot. for Summ. J. at 4.

29

devoted to a public use. *See* South Burlington's Mot. for Partial Summ. J. at 32 (citing Our Lady of Ephesus House of Prayer, 2005 VT 16, ¶ 23); Burlington's Mot. for Summ. J. at 19–27.

The court questions the utility of strictly applying the three-part Am. Museum of Fly Fishing test here, for two reasons. First, that test was originally established with regard to the public use exemption in section 3802(4) which, unlike the sections 754 and 3659 taxation schemes, is an explicit and total exemption for property put to a public use. Second, a strict application of the "dedicated unconditionally to public use" and "non-for-profit" prongs of that test would exclude a finding of "public use" in situations where it would be nonsensical to do so. *See* Twin Valley Cmty. Servs., Inc. v. Town of Randolph, 170 Vt. 648, 649–50 (2000) (requiring a "concurrence of nonprofit ownership and use" between taxpayer-owner and lessee-operator). For example, such an application might automatically exclude application of the special taxation statutes to all the various private industry tenants located in the terminal building, such as restaurants, car rentals, newsstands, and areas used for airline operations, because those tenants all operate on a for-profit basis. Those are operations which are clearly essential to efficient and convenient operation of the airport, and which the City has apparently not even tried to tax, although it claims it could do so. *See* South Burlington's Opp'n at 44 (citing City of Little Rock v. McIntosh, 319 Ark. 423 (1995)). The court believes the three-factor Am. Museum of Fly Fishing test offers useful guidance, but declines to strictly apply it here where the more general and flexible "primary use" inquiry is appropriate.

Taxpayer also urges the court to view the airport as a whole; since the whole airport is primarily devoted to a public use, any private leaseholds are merely incidental to that primary purpose. The City argues that the private leaseholds must be viewed individually. Framed that

30

way, the City contends, the leaseholds are not primarily put to a public use. Taxpayer counters that even viewed individually, the private leaseholds still pass the public use test.

The court sees no bar on viewing the leaseholds separately for purposes of determining whether the primary use of those leaseholds is public. *See* Scott Const., Inc. v. City of Newport Bd. of Civil Auth., 165 Vt. 232, 237–38 (1996) (municipality could appraise real property for tax purposes by applying separate valuation criteria to parts of parcel, by considering development scenario, and was not limited to contemplating single use of entire, undivided parcel); *see also* Medical Center Hospital v. City of Burlington, 131 Vt. 196, 199 (1973) ("While the precise question has not, to our knowledge, been heretofore presented to this Court, it has been held that where property of a tax exempt institution is devoted partly to public uses, a building may be divided, for the purpose of taxing that part of it engaged in business use and exempt that part devoted to public use."). Many courts have made a public use determination as to individual tracts of a larger property. *See generally* 114 A.L.R.5th 561.

The City has not attempted to divide up buildings into "public use" and "private use" in an irrational manner. Instead, it has attempted to tax entire buildings or facilities which it deems to be operated primarily for a private use, while it has not tried to tax other large parts of the airport clearly devoted to a public use, such as runways and the entire airport terminal building.[20] Taxpayer cites to its City Charter § 64b(a)(2), which simply defines "airport" to mean: "the entire airport now owned by the City, including runways, hangars, loading facilities, repair shops, terminals, retail stores in such terminals, restaurants, parking areas, and other facilities necessary or convenient for the operation of the airport, together with any improvements thereto hereafter

---

[20] It is not clear to the court whether the City means that it has not tried to tax certain parts of the airport at all, or whether it means that it has tried to tax those parts pursuant to the formula under section 3659 as opposed to full fair market value. However, this does not appear to be a disputed issue.

31

constructed or acquired." 24 App. V.S.A. § 64b(a)(2). However, it does not point to anything suggesting that this general definition is binding in the context of tax valuation.

Taxpayer also argues that whether municipal property is devoted to a public use may be determined by legislative declaration. *See* Martha's Vineyard Land Bank Comm'n v. Bd. of Assessors of W. Tisbury, 62 Mass. App. Ct. 25, 31 (2004) (holding that land bank commission was exempt from taxation where legislature buttressed commission's powers with "explicit declarations that their exercise is to be deemed 'an essential governmental function' and that the entire enabling act is to be 'liberally construed' to effect the public purposes set forth therein for the welfare of the inhabitants of Martha's Vineyard). While this may be true in some cases, Martha's Vineyard is inapposite to the present case. There, the commission's enabling act provided that its real property is exempt "from taxation of any sort" during the period when it is "used solely . . . in furtherance of its public purposes"—a use to which the parties stipulated in that case. Id. at 28. "Then, that categorical exemption is functionally reinforced by the immediately following language, which explicitly frees the commission from having to pay *any* State or local tax or assessment on its real property so used or otherwise." Id. at 28–29.

Nor is Dade Cty. v. Pan Am. World Airways, Inc., 275 So. 2d 505, 510 (Fla. 1973) helpful. That decision, aided by legislative declarations, held that an airline's lease of airport property constituted a public use and was tax exempt. However, as the City points out, the statutes then at issue in that case have since been repealed, and the current public use test in Florida is the actual use of the leased property. *See* St. John's Associates v. Mallard, 366 So. 2d 34, 37 (Fla. Dist. Ct. App. 1978) ("Legislative declarations . . . do not necessarily make the function a commercial lessee performs governmental. It is rather the actual use made of the leased property which determines whether it is taxable under the constitution.").

More importantly, the Vermont authorities cited by Taxpayer do not demonstrate any such clear legislative declaration. *See*, *e.g.*, 5 V.S.A. § 751 (noting that it is state policy to assist municipalities in selecting and acquiring sites for airport development); Burlington City Charter § 48(50) (24 App. V.S.A. § 3-48(50)) (authorizing Burlington to acquire, maintain, and properly equip "within the limits of an adjoining town, a public aviation field and municipal airport"); id. § 276(a) (discussing governance of "the public aviation field and municipal airport . . . located within the limits of . . . South Burlington").

Cases in other jurisdictions have analyzed portions of airport property separately. Some have determined that portions of public airport property leased to private entities were not devoted to public use.[21] Others have found that certain private leaseholds in publicly-owned airports served a public purpose.[22]

---

[21] *See* 114 A.L.R.5th 561, §§ 14(b), 24(b), 25; *see also, e.g.*, City of Little Rock v. McIntosh, 319 Ark. 423, 430 (1995) (tracts of airport leased to private businesses for operation of aircraft modification center and two aircraft service centers were not exempt because they did not exclusively serve a public purpose); Town of Harrison v. Westchester Cty., 13 N.Y.2d 258, 263–64 (1963) (hangars and land occupied by private corporations as lessees or sublessees under long-term leases were not exempt); Du Page Cty. Airport Auth. v. Dep't of Revenue, 358 Ill. App. 3d 476, 478–81, 498 (2005) (properties leased to third parties and used as a golf course, office building and tie-down area for aircraft, auto repair facility, commercial cellular tower, and farms did not meet standard for "Airport Authority purposes" under Illinois statute and was not exempt); Greater Orlando Aviation Auth. v. Crotty, 775 So. 2d 978, 981 (Fla. Dist. Ct. App. 2000) (airport hotel was operated by airport authority for a profit rather than to provide public benefits to citizens of Orlando and thus not exempt under the exclusive municipal or public purposes provision of Florida constitution); Page v. City of Fernandina Beach, 714 So. 2d 1070, 1075–76 (Fla. Dist. Ct. App. 1998) (airport not used exclusively for public purposes, where one lessee used premises to offer aviation services to general public and sell edibles within terminal, while another lessee conducted national air shows); Mallard v. Tele-Trip Co., 398 So. 2d 969, 971 (Fla. Dist. Ct. App. 1981) (no exemption for company that operated air travel insurance concession at international airport); Appeal of Moon Twp., 387 Pa. 144, 150–51 (1956) (jewelry store, display windows and area, drugstore, and newsstand were merely attractions for airport patrons, rather than necessary to efficient operation of airport, and therefore not exempt); In re Application of Strother Field Airport for Exemption from Ad Valorem Taxation in Cowley Cty., Kansas, 46 Kan. App. 2d 316, 322–24 (2011) (municipally owned airport not entitled to tax exemption for portion leased to General Electric for its operation of refurbishing, reconditioning, and rebuilding aircraft engines, a multi-million dollar business).

[22] *See* 114 A.L.R.5th 561, §§ 14(a), 24(a); *see also* Dade Cty. v. Pan Am. World Airways, Inc., 275 So. 2d 505, 511 (Fla. 1973) (property at airport leased to airline "is clearly leased and used for the public purpose of providing indispensable air transportation and an air terminal to [a] metropolitan area as an essential public service . . ."); Appeal of Allegheny Cty., 425 Pa. 578, 582 (1967) (hotel, restaurant, portion of drug store, and newsstand located within airport terminal building but operated by concessioners, were exempt); In re Bd. of Prop. Assessment, 797 A.2d 414,

As explained above, Taxpayer has the burden to prove that its property is primarily put to a public use. For the purposes of the pending summary judgment motions, there are four private leaseholds on the airport property which have been set in the grand list by the City as taxable, and the public use of which is disputed. The court will address each in turn.

A. 15 Eagle Drive

It is undisputed that 15 Eagle Drive is used by Pratt & Whitney to perform engine services on aircraft, including general aviation, commercial, charter, and fractional ownership aircraft, whose owners/pilots visit the facility for maintenance, repair, or engine refurbishment. *See* South Burlington's SMF ¶ 9. Taxpayer also alleges that Pratt & Whitney performs emergency maintenance on almost any aircraft that comes into the airport. *See* Burlington's Resp. ¶ 9 (citing Ex. 7 (McEwing Depo) at 128–32).[23]

The undisputed facts do not establish whether Pratt & Whitney's services are necessary to airport operations. The fact that Pratt & Whitney performs emergency maintenance on almost any aircraft that comes into the airport, if proved, might render this improvement primarily a public use. Emergency maintenance on aircraft is certainly essential to an airport's operation, and provides a clear benefit to the travelling public. However, there are no facts in the record concerning the frequency of such emergency maintenance performed by Pratt & Whitney, whether

418–20 (Pa. Commw. Ct. 2002) (facilities at county owned airport terminal that sold candy/alcoholic beverages were reasonably necessary to efficiently operate airport rather than mere conveniences); Charleston Cty. Aviation Auth. v. Wasson, 277 S.C. 480, 487–89 (1982) (lease of county airport to airlines, car rental companies, parking lot operator, limo taxi service, air cargo company, and operator of restaurant, snack bar, lounge, and gift shop were recognized as necessary part of public airports and exempt); City of Osceola v. Bd. of Review of Clarke Cty., 490 N.W.2d 539, 542 (Iowa 1992) (on-site residence provided to manager of municipal airport on airport property was public use and exempt); City of Toledo v. Jenkins, 143 Ohio St. 141, 156 (1944) (substation w/transformers, distribution system, electrical equipment, office where gas sales recorded, outgoing planes registered, and floodlights for field illumination was devoted to a public use and exempt).

[23] Taxpayer's statement that Pratt & Whitney performs emergency services on aircraft is an additional fact that came in response to the City's statement of facts, to which the City did not have a duty to reply and did not reply. Thus, this additional fact must be treated as disputed for purposes of summary judgment.

there are other businesses or facilities on the airport that perform such a function, or what percentage of Pratt & Whitney's work is for general aviation as opposed to private charter or fractional ownership planes. *See, e.g.*, Ex. 7 (McEwing depo.) at 131–32. Absent such facts, the court cannot determine whether the improvement at 15 Eagle Drive is primarily devoted to a public use.

### B. 73 Customs Drive

The parties agree that 73 Customs Drive contains a FedEx facility that provides air shipping of packages for customers. *See* South Burlington's SMF ¶ 10. Taxpayer also alleges that FedEx has a flight into and out of the airport every day that serves an air cargo function. The facility houses the equipment needed to maintain FedEx's aircraft, plus the equipment needed to load and unload that aircraft. The air cargo function carried out by FedEx provides a benefit to the community. *See* Burlington's Resp. ¶ 10 (citing Ex. GG (McEwing Depo) at 99–101; Ex. HH (Hodges Depo) at 279). [24]

Generally, other courts have concluded that air cargo facilities located on airports are not operated for a public purpose in the context of tax exemption. *See* Emery Worldwide, 2005 WL 563323, at *7 (private cargo transportation business located on airport not a public use); Clayton, 271 Ga. App. at 87 (facility leased to postal service at airport did not facilitate "effective operation" of airport, and thus not exempt). However, at least one court has reached a different conclusion. In Charleston, the South Carolina court held that the lease of part of a county airport to an air cargo company, among other private businesses, was recognized as a necessary part of the public airport customarily performed by private business, and thus was incidental to public uses. 277 S.C. at 488–89. Although the analysis was limited, the court there noted the property was leased to

---

[24] The court treats Taxpayer's additional facts as disputed for purposes of summary judgment.

Carolina Air Terminal, Inc., which it used "in providing cargo facilities to air carriers." Id. at 484. "Without their services passenger and freight transportation would not be available, or if available, would be materially limited or restricted." Id. at 488. It appears that the air cargo company in Charleston was of a different nature than a FedEx, UPS, or U.S. Postal facility, such as the facility at Burlington International Airport.

The FedEx facility here is more similar to the air cargo facilities in Emery and Clayton. In Emery, for instance, the air cargo tenant "offer[ed] no service directly associated with use of the airport by the general public. Rather, [the company's] use of airport property merely facilitate[d] its more general, private business purpose, i.e., the transportation of cargo." 2005 WL 563323, at *7. Likewise, in Clayton, "while it was economical and convenient for the Postal Service to have an onsite annex to its newer facility, the Postal Service's use of the annex did not 'facilitate the effective operation of the airport.' Instead, it facilitated the effective operations of the Postal Service." 271 Ga. App. at 87. Though FedEx's use of the airport undoubtedly benefits its private business purpose, there is no evidence that any public benefit from its use is anything more than incidental to its primary, private purpose, nor that it is essential or even convenient for airport operations. Taxpayer's claim that the FedEx facility benefits the community is too general, attenuated, and tangential to demonstrate a public use. Any private business could be said to provide general economic benefits to the community, but that does not make its use "public" for tax exemption purposes. This location is subject to taxation at full market value.

C. 1120 Airport Drive ("South Hangar" and "T-Hangars")

1120 Airport Drive is used for leasing of aircraft storage space to private aircraft owners. See South Burlington's SMF ¶ 11. Taxpayer also alleges the following. 1120 Airport Drive also houses the Heritage Ground Support Equipment ("GSE") team, which includes three full-time staff

members. The GSE team services any and all ground support equipment at the airport that is necessary for airline travel, including fueling and de-icing trucks, ground power units, airplane tugs, and baggage loaders and carts. Heritage is an FAA-certified repair station providing maintenance for almost all types of aircraft, as well as 24/7 ground handling, fueling, de-icing, and related aviation support. Additionally, Heritage is the only provider of fueling and de-icing services to airlines and general aviation aircraft at the airport. Heritage further provides at 1120 Airport Drive a terminal lobby which serves as an access point for pilots and passengers of general aviation aircraft. *See* Burlington's Resp. ¶ 11 (citing Ex. II (affidavit of Carol Betz) ¶¶ 2, 4, 6, 7).[25]

The out of state case law holds that tracts of airports rented out for private aircraft storage and hangars are not held for a public use. *See*, *e.g.*, Marshall Cty. Airport Bd., 163 Ill. App. 3d at 876; Pike Cty. Bd. of Assessment Appeals, 932 S.W.2d at 380; Town of Harrison, 13 N.Y.2d at 263-64; Chemung Cty., 265 N.Y.S.2d at 459–60; H. K. Porter Co., 421 Pa. at 441–42; Reading Mun. Airport Auth., 4 Pa. Cmwlth. at 304–05; Du Page Cty. Airport Auth., 358 Ill. App. 3d at 478–81, 498. However, if Taxpayer's allegations are proved at trial, that would establish that the Heritage GSE team is based there, that it provides all ground support equipment necessary at the airport, and that it is the only provider of fueling and de-icing services to airlines. Surely this service is necessary to efficient airport operations, as flights in winter months would be exceedingly difficult without de-icing, and impossible at any time without fuel. These facts are, however, not conceded by the City and thus must await resolution at trial.

### D. 1150 Airport Drive ("North Hangar")

1150 Airport Drive is used for the rental of hangar space to private aircraft owners, and office space to commercial tenants, including a fishing equipment manufacturer and two general

---

[25] As discussed above, the court treats all of Taxpayer's additional facts alleged in response to the City's statement of facts as disputed for purposes of summary judgment.

contractors. The City also claims the tenants there have "no involvement" in the airport's operations. While some of the commercial tenants have some connection to private aircraft activities, the City states, they do not support the airport's "operation for the travelling public." *See* South Burlington's SMF ¶ 12 and n.8.

Taxpayer asserts that the tenants have involvement with airport operations, noting that as of April 1, 2012, this facility was occupied by an aircraft mechanic and flight instructor as a business, and that equipment used to service scheduled air carriers was stored here. *See* Burlington's Resp. ¶ 12; *see also* Ex. 11 (Gagnon Depo) at 131–32. Taxpayer also argues that the commercial tenants' private aviation activities support the airport's operation for the benefit of the travelling public. *See* Ex. JJ (affidavit of Jim Richards, manager of Aerodyme Corporation) ¶ 6 (stating that general aviation operations at the airport add to the overall numbers of operations there, which increases the airport's capabilities, number of flights, and ability to receive staffing increases for air traffic control and new safety technology).

As stated above, the out of state case law holds that tracts of airports rented out for private aircraft storage and hangars are not held for a public use. *See*, *e.g.*, Marshall Cty. Airport Bd., 163 Ill. App. 3d at 876; Pike Cty. Bd. of Assessment Appeals, 932 S.W.2d at 380; Town of Harrison, 13 N.Y.2d at 263-64; Chemung Cty., 265 N.Y.S.2d at 459–60; H. K. Porter Co., 421 Pa. at 441–42; Reading Mun. Airport Auth., 4 Pa. Cmwlth. at 304–05; Du Page Cty. Airport Auth., 358 Ill. App. 3d at 478–81, 498. Further, unlike 1120 Airport Drive, there is no indication that any service similar to the GSE team's fueling and de-icing occurs at 1150 Airport Drive. Again, Taxpayer's evidence that general aviation activities at the airport benefit the public through increased funding and new security technology, even if true, is simply too attenuated to establish 1150 Airport Drive as a public use for tax purposes. The availability of private hangars for rent undoubtedly provides

38

some general public benefit to the airport and the region. That does not make the improvement primarily devoted to a public use or essential to efficient airport operations. *Cf.* Town of Harrison, 13 N.Y.2d 258 at 265 ("The Legislature may quite properly conclude that hangars for private parties are essential to the economy and in the public interest [for purposes of land condemnation] . . . . But it by no means follows . . . that the parties using the private hangars should not bear their proper share of the tax burden, that that entire burden should be thrown on the residents and other taxpayers of the town.").

Nor is the fact that a particular leasehold produces revenue for the airport sufficient to constitute a public use. *See* Strother Field, 46 Kan. App. 2d at 323 ("it cannot be said that revenue generation alone satisfies an exemption statute requiring a 'purpose essential to the operation of an airport'"); Greater Orlando Aviation Auth., 775 So. 2d at 980 (airport hotel was not exempt where negotiations between aviation authority and airlines regarding hotel "focused almost exclusively on the revenue-generating aspects of the hotel"); Marshall Cty. Airport Bd., 163 Ill. App. 3d at 876 ("Property is not exempt from taxation merely because the income from it is used for an exempt purpose where the property itself is not so employed."); Town of Harrison, 13 N.Y.2d at 264 ("that rentals from municipally owned property provide needed revenue for the governmental body, enabling it to carry out its public functions, is not sufficient to render the use of the property public; the property itself must be devoted to a public use"); 16 McQuillin Mun. Corp. § 44:74 (3d ed.) ("it is generally held that . . . property of a municipality is subject to taxation if it is not devoted to public use but is held for revenue or like purposes, . . . . [But] the mere fact that some revenue is incidentally derived from public property primarily and principally devoted to a public use does not in and of itself alter the character of the holding as one for a public purpose . . . .").

The court concludes that even assuming the facts asserted by Taxpayer, 73 Customs Drive is not primarily devoted to public use. It is therefore subject to taxation at full fair market value rather than under section 3659.

## V.     The Noise Lots

Taxpayer argues that certain portions of the "noise lots" are subject to the special rules applicable to lands financed with state funds, 5 V.S.A. § 754. As the more specific statute, if section 754 applies, then it controls over any other tax statute that could apply. *See* Looker v. City of Rutland, 144 Vt. 344, 346 (1984) ("An established rule of statutory construction is that when two statutes deal with the same subject matter, and one is general and the other specific, the more specific statute must be given effect unless the legislature intended the general to control."). To the extent that section 754 does not apply, section 3659 will apply.

### A.     5 V.S.A. § 754

#### i.     Purchase Financed in Conformity with Sections 751–753

Taxpayer argues that at least 130.2 acres of the land at issue were acquired pursuant to sections 751–53, and are therefore governed by section 754 and subject to a payment in lieu of taxes. To support this contention, Taxpayer cites to a 1943 Burlington City Engineer Report (Ex. E) and a 1996 Tax Stabilization Agreement between Taxpayer and the City (Ex. F). The Engineer Report lists several parcels acquired by Taxpayer between 1931 and 1942 for the "Airport development." It is notable that the acreage of the last 14 properties listed, starting with Moses Dumas property purchased July 21, 1941 and ending with the Brownell Estate purchased August 28, 1942, adds up to exactly 130.2. Exhibit A to the Tax Stabilization Agreement describes the airport property as including "130.2 acres of land (acquired pursuant to 5 V.S.A. Chapter 7 prior to 1972)."

40

Both Taxpayer and the City signed the Tax Stabilization Agreement in 1996, and the agreement does not contain any reservations, objections, or refusals to concede that 130.2 acres of airport property were acquired pursuant to the predecessors to sections 751–753. Thus, the court deems that fact admitted by both parties. However, the court is unable to determine on the record before it exactly which parcels make up that 130.2 acres. Taxpayer's Ex. CC, consisting of an airport map and list of parcels with identification numbers, as well as Ex. E (engineer's report), demonstrate a triable issue as to which of the parcels make up that 130.2 acres acquired pursuant to sections 751–753, but are not conclusive. That issue will need to be determined at trial.

The City alleges that because of a discovery violation by Taxpayer, the engineer report and tax stabilization agreement should not be considered. Although Taxpayer may not have been compliant with discovery, it did submit these documents in the summary judgement phase rather than for the first time at trial. This is an important issue in a complex case, best decided on the merits. The court further notes that the City has had plenty of time since the last filing to seek additional discovery on this issue, and will have additional time if needed prior to trial. Perhaps most importantly, the City was a party to the tax stabilization agreement, has surely had that agreement in its possession since 1996, and it cannot now argue that it is prejudiced by its production.

## ii. Federal Funds

The parties argue over whether section 754 applies to lands acquired in part with federal funds. Taxpayer contends that all land acquired subsequent to enactment of the predecessor to § 754 is covered by that section to the extent that the land was acquired with a combination of federal, state, and local funds. *See* Burlington's Mot. for Partial Summ. J. at 11 n.3. Taxpayer

submitted an affidavit by the former Director of Planning and Development at the airport providing that:

> Land acquisitions and capital improvements at BTV pursuant to the AIP program have been funded with federal, state, and local dollars according to the following split: Pre-Federal Fiscal Year ("FFY") 2004—Federal 90%, State 6%, local 4%; FFY2004-FFY2011—Federal 95%, State 3%, local 2%; with §§ 751–53. and Federal FY2012-current—Federal 90%, State 6%, local 4%.

Ex. H (Aff. of Robert McEwing) (dated July 15, 2015) ¶ 11. "AIP" refers to the FAA-administered Airport Improvement Program, which provides federal grants for the acquisition of land for airport growth and development. Id. ¶ 3. Additionally, Exhibit CC consists of an airport map and list of parcels with acquisition dates, as well as notations that certain parcels were acquired through the AIP program. The City argues there is "no indication in the plain language of section 754 or its predecessors that the statute is intended to apply to land acquired with federal funds, whether those funds be primary, matching or incidentally contributory." South Burlington's Opp'n at 30.

The taxation scheme in section 754 applies to "land purchased in conformity with sections 751–753 . . . ." Section 753 provides that money from a state appropriation "shall be used to match, dollar for dollar, money appropriated, raised, or contributed by a local governmental unit, city or town, or by a combination of units for the purchase of lands or rights in land for airport, landing field, air navigation facilities, or landing strip purposes." Nowhere in sections 751–754 is there a prohibition against the use of federal money for such acquisitions, nor is there a requirement that the land must be purchased only with state and local matching funds to qualify for section 754 taxation. In fact, section 751 implicitly recognizes the possibility of federal financial assistance, declaring it state policy to assist municipalities to acquire airport land "[t]o provide for the orderly development of air facilities in this state *and to cooperate with the national government* by making

available sites for airports, landing fields, air navigation facilities, and landing strips necessary for defense against an attack by sea or air . . . ." (emphasis added).

The City's reliance on subchapters 3 (5 V.S.A. §§ 691–697) (state aid to municipalities in conjunction with receipt of federal funds for airport development) and 5 (5 V.S.A. §§ 771–774) (state aid for repairs at municipal and private airports) is unpersuasive. The City contends that because the legislature expressly included in subchapter 4 (sections 751–754) a tax exemption for land acquired pursuant to that subchapter, and excluded any such special tax treatment for land or improvements acquired under subchapters 3 and 5, section 754 cannot apply to land or improvements acquired or repaired under subchapters 3 or 5. That may be true, but the issue is whether airport land can be acquired in conformance with sections 751–753 even if it was funded, in part, with federal money. The plain language of the statute clearly leaves open that possibility. The precursor to sections 751–754 was enacted for the purpose of taking advantage of a proposed federal grant that was conditioned upon Taxpayer owning title to a certain amount of real estate. *See* Ex. LL through PP. Taxpayer sought state aid to purchase the property because the owners were demanding a high price. *See* id. The available history behind the statute does not indicate an intent to preclude application of section 754 tax treatment if the purchase of the property was aided with federal funds, in addition to state and local matching funds. There is no rational reason to think the legislature would object if the town or state found the money for airport property acquisitions in federal coffers. Thus, the court grants summary judgment for Taxpayer on this issue; section 754 can apply to lands acquired in part with federal funds. The exact parcels to which section 754 applies in this case will be determined at trial.

iii.  Taxation of Improvements

Another area of dispute involving section 754 is whether buildings or improvements on land subject to that statute are taxable. Again, the statute reads:

> Title to land purchased in conformity with sections 751-753 of this title shall vest entirely in the state, jointly in the state and the local governmental units, or entirely in the local governmental units as in each case is most proper. Land so acquired shall not be taxable, but when the title vests in the state or when the title is held jointly by the state and a town or towns, and the site is located in a different town or when the title vests in one or more towns and the site exists in a different town, then the holders of the title shall make an annual payment, instead of taxes, to the town in which the site is located of a sum equal to the tax otherwise assessed on the land alone.

5 V.S.A. § 754. While the statute provides for a payment in lieu of taxes "of a sum equal to the tax otherwise assessed on the land alone," the City contends that because it is silent as to improvements located on that land, improvements are taxed at full fair market value. Taxpayer, of course, reads the silence as to improvements to mean that improvements are not taxed.

There is no Supreme Court caselaw discussing sections 751–754. However, the legislative history of those statutes may be summarized as follows. In 1941, just months before the United States officially entered World War II, the legislature passed H. 215 as Act No. 101 (1941), "An Act to Provide State Aid in the Development of Air Facilities, to Make an Appropriate Therefor and to Prescribe Conditions for the Expenditure Thereof." *See* Ex. P. The Act established an appropriation of state funds to aid municipalities in developing airport facilities. Id. Land acquired by municipalities with matching state funds was to be exempt from taxation, but subject to a payment in lieu of taxes. Id. Prior to passage of the bill, House Aviation committee meeting notes describe the tax exemption as a "provision in re taxation of land so acquired: land shouldn't be taxed but the owner should pay annually the average [amount] paid by the owner of same land during preceding quadrennial." *See* Ex. Q at 7. Section 5 of Act 101 is substantially similar to, and

44

eventually became, 5 V.S.A. § 754. In addition to the $65,000 state fund to aid municipalities in purchasing land for airport development, Act 101 also created the Vermont Aeronautics Commission to administer that state fund. *See* Ex. PP.

A previous trial court decision addressed this issue, and concluded:

> [T]he plain language of § 754 evinces a clear intent to exempt only land from taxation. The statute refers only to 'land,' and to construe § 754 more broadly would be contrary to the mandate to construe tax exemptions strictly. Moreover, where the legislature has intended to refer to both land and improvements, it has done so explicitly. See 32 V.S.A. § 3659.

Heritage Aviation, et al v. City of South Burlington, Decision on Rule 12(b)(6) Motion to Dismiss, Docket No. 1425-11 CnC, at 4 (Vt. Super. Ct. Jan. 3, 2013) (J. Crawford). The court also cited Attorney General Opinion 1956-58, which observed that in enacting sections 754 and 3659, "the legislature was careful to spell out that only the *land* purchased for airport purposes was exempt." (emphasis in original). Although section 754 makes no direct reference to buildings constructed on the land, the Attorney General opined that "there is a clear reference that any exemption granted by those sections does not extend to buildings constructed on the land." 1956-58 Op. Atty. Gen. 206. The court noted that this Attorney General Opinion was cited in the annotations to former section 414, "and that the legislature thereafter enacted the successor section, § 754, without broadening the scope of the exemption." Heritage Aviation, et al v. City of South Burlington, Decision on Rule 12(b)(6) Motion to Dismiss, Docket No. 1425-11 CnC at 4. Finally, the court noted that the statute's reference to the "land alone" in the last sentence of § 754 did not alter its conclusion that the statute exempts only land from taxation.

> That description fixing the amount of the annual payment makes it clear that the size of the payment depends only on what the tax would have been on the land alone, rather than on the land plus any improvements. Far from being superfluous, the language serves to

45

> highlight that the calculation of the annual payment is performed in a way different than the usual appraisal for real estate.

Id. at 4.

This court does not agree with that rationale. The previous trial court decision speaks of construing tax exemptions strictly. However, like section 3659, section 754 is not an exemption statute, but a statute permitting taxation of property otherwise exempt. *See*, *e.g.*, Swanton, 131 Vt. at 322; Morrisville II, 131 Vt. at 593–94; Morrisville III, 134 Vt. at 328. Hence, it must be strictly construed against the taxing authority and in favor of the taxpayer. *See* City of Montpelier, 143 Vt. at 293. Nor is section 754 a "tax exemption" as a practical matter. An "annual payment, instead of taxes . . . of a sum equal to the tax otherwise assessed on the land alone" is not an exemption, and any characterization of it as an exemption is a legal fiction.

Under the previous trial court decision's analysis, while the land is subject to an annual payment in lieu of taxes, the improvements would be taxed at full fair market value. Taking that decision and the City's argument to their logical conclusion, section 754 would provide no special tax treatment, as Taxpayer would pay, effectively, taxes based on a full fair market value assessment of the land and the improvements. Thus, tax treatment pursuant to section 754 would be less favorable for Taxpayer than under section 3659, and the same as under the default taxation scheme. It would make no sense for the legislature to enact a statutory scheme allowing municipally owned extra-territorial airports that were acquired with state financing to be taxed the same as privately owned property. *See* Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129 (court will not interpret statutes to produce absurd or unreasonable results). Thus, the court grants Taxpayer summary judgment on this issue: for lands covered by section 754, the payments in lieu of taxes are based on the value of the land alone.

### B. 32 V.S.A. § 3659

Both parties agree that because the noise lots are municipal property located in a different municipality, 32 V.S.A. § 3659 applies unless—as is addressed above—section 754 applies.[26] However, they disagree over the meaning of the statute. The disagreement stems from the statute's apparent distinction between land and buildings, as well as its silence on preexisting improvements.

i.  Valuation in the Year of Acquisition

Section 3659 permits the limited taxation of municipally owned property existing within the territory of another municipality.  It reads in relevant part:

> Land and buildings of a municipal corporation, whether acquired by purchase or condemnation and situated outside of its territorial limits shall be taxed by the municipality in which such land is situated. Said land shall be set to such municipal corporation in the grand list of the town or city in which such real estate is located at the value fixed in the appraisal next preceding the date of acquisition of such property and taxed on such valuation. The value fixed on such property at each appraisal thereafter shall be the same per acre as the value fixed on similar property in the town or city. Improvements made subsequent to the acquisition of the land shall not be taxed; except that an additional tax not to exceed 75 percent of the appraisal of the land may be levied in lieu of a personal property tax.

32 V.S.A. § 3659. The statute separates the taxability of land from the taxability of improvements on the land.  Swanton Village v. Town of Highgate, 131 Vt. 318, 323 (1973).  The land is taxable; improvements following ownership are not. However, the statutory language does not explicitly say whether preexisting improvements (i.e., buildings existing on the property before acquisition by the municipality) are taxable.

---

[26] In its Reply, Taxpayer raises a new claim that the entire airport is totally exempt from taxation under the public use exception in 32 V.S.A. § 3802(4). This argument is unpersuasive.

The first sentence provides that "[*l*]*and and buildings* of a municipal corporation . . . shall be taxed . . . ." (emphasis added). The next sentence, however, mentions only the land: "*Said land* shall be set . . . in the grand list . . . at the value fixed in the appraisal next preceding the date of acquisition of such property and taxed on such valuation." (emphasis added). Then, the value fixed on "*such property* at each appraisal thereafter shall be the same per acre as the value fixed on *similar property*" in the situs municipality. (emphasis added). Finally, "*[i]mprovements made subsequent to the acquisition of the land* shall not be taxed" except for the additional payment in lieu of taxes "not to exceed 75 percent of the appraisal of the *land* . . . ." (emphasis added). Again, the statute makes no specific reference to preexisting improvements. The apparent confusion is the initial reference to "[l]ands and buildings" as taxable, as compared to the later specific references to "land" and "[i]mprovements made subsequent to the acquisition of the land."

The City's position appears to be inconsistent. First, it asks the court to hold that the noise lots should be forever taxed based upon (1) the land value based on the per-acre fair market value of comparable residential land in the City, and (2) the fair market value of the improvements which existed at the time of Taxpayer's acquisition (even if they are no longer there). *See* South Burlington's Mot. for Summ. J. at 19–20. In a later filing, it argues that if the houses have been removed, the valuation can be based upon the open land. *See* South Burlington's Reply at 10.

Taxpayer responds that the City may tax the noise lots at the value per acre of the <u>land alone</u>, plus an additional tax computed on no more than 75% of the value of that <u>land</u> to reflect any improvement made <u>subsequent</u> to acquisition, but no further. Effectively, Taxpayer's position is that the limit on the airport's value for tax purposes can be expressed by the following equation: [the value of the land alone] X [1.75]. Thus, according to Taxpayer, any amount the City has assessed for airport property over and above 175% of the value of the land alone exceeds statutory

authority. It should be noted that the noise lots contain no post-acquisition improvements, because the Airport is tearing down the former residences in favor of green space. Thus, for any lots where the residences have been removed, Taxpayer's approach would lead to a tax solely on the land, both before and after acquisition.[27]

In addition to the language of the statute that "[l]ands and buildings . . . shall be taxed," there are several authorities that support the City's reading of § 3659 as to the taxability of preexisting improvements. First, Judge Bent stated in a 2013 trial court opinion that

> Section 3659 allows a municipality to *impose a tax on* the land owned by another municipality and the *buildings existing on that land when it was acquired.* It does not allow taxation on improvements thereafter, but it does allow an additional tax on the land to compensate for the inability to tax improvements and personal property.
> . . .
> The Town thus argues that the [water] mains are "land" within the meaning of § 3659. It does so by applying the law of fixtures. Section 3659, however, deviates from the law of fixtures for taxation purposes by separating the taxability of *land* from the taxability of *improvements*. *The former is taxable; the latter are not unless on the land at the time it was purchased.*

Village of Northfield v. Town of Northfield, Nos. 559-9-11 and 567-9-11 Wncv, slip op. at 5 (Vt. Super. Ct. Jan. 25, 2013) (emphasis added). Second, a 1956 Attorney General Opinion reached the same conclusion as to the predecessor to § 3659: "Plainly, any buildings on airport land at the time of the purchase or condemnation of such land are taxable by the formula provided in No. 17, 1949." 1956-58 Op. Atty. Gen. 206, 208. Third, the legislative intent of § 3659 as articulated by the

---

[27] The court observes that, like the City's argument, Taxpayer's argument is also somewhat inconsistent. While it claims initially that all pre-existing buildings are not taxed at all, it also contends (in the alternative, apparently) that assuming those buildings are taxed, "similar" property taxation includes such buildings until demolished. *See* Burlington's Opp'n at 8–9. Taxpayer is further inconsistent in that the Silver appraisal apparently values all noise lots (vacant or not) as commercial/industrial/transportation development, whereas its actual argument in the briefing does not go quite so far, in that it concedes that the homes may be taxed until demolished. *See* id. The court treats these as alternative arguments.

Supreme Court is that "the town of situs neither gain nor lose in its tax base through municipal ownership and development." Morrisville III, 134 Vt. at 330.

Lastly, Swanton v. Highgate notes that House Bill 58 in 1949, which proposed changes to the precursor to § 3659, allowed for the taxation of municipal, extraterritorial "lands and also including buildings thereon at their full assessed value." 131 Vt. at 322. The Senate "did not approve of the taxation of improvements made after the acquisition of land," and the legislature eventually "reach[ed] a compromise between the intent of the House . . . to tax all improvements to the land owned by municipal corporations and the intent of the Senate not to tax improvements made subsequent to the acquisition of such land . . . ." Id. at 322–23.

Taxpayer argues that the statutory silence on pre-existing improvements should be interpreted strictly against the City as the taxing authority, and cites cases stating that general proposition, as well as an example of the Vermont legislature specifically taxing buildings. "Without express statutory authority to tax preexisting improvements, South Burlington cannot do so at all." Burlington's Opp'n at 5; *see also* City of Montpelier v. Town of Berlin, 143 Vt. 291, 293 (1983) ("[t]he taxing power granted by this statute [§ 3659] is to be strictly construed"); 32 V.S.A. § 3608 ("Buildings on leased land or on land not owned by the owner of the buildings shall be set in the list as real estate."); Gordon v. Bd. of Civil Auth. for Town of Morristown, 2006 VT 94, ¶ 8, 180 Vt. 299 ("By enacting § 3608, the Legislature specifically included buildings on leased land in the definition of taxable real estate, and recognized that a building can be taxed separately from the land upon which it sits.").

The court concludes that the discussion in Swanton is persuasive, and that the perceived "statutory silence" as to preexisting improvements is really not statutory silence at all. Rather, the language of the statute is clear enough. It provides that "[*l*]*and and buildings* of a municipal

50

corporation . . . shall be taxed . . . ." 32 V.S.A. § 3659 (emphasis added). It makes no sense to ignore the reference to buildings merely because it is not repeated in the next sentence. "[S]uch property" can only logically be read to mean the land including the buildings on the land. Unlike 5 V.S.A. § 754, which does not reference buildings at all and which was be discussed above, 32 V.S.A. § 3659 unambiguously taxes preexisting improvements at the fair market value as of the last appraisal prior to acquisition.[28]

## ii. Valuation in Later Years

The parties also disagree over how to value the noise lots in the years after acquisition.[29] Section 3659 provides that:

> Said land shall be set to such municipal corporation in the grand list of the town or city in which such real estate is located at the value fixed in the appraisal next preceding the date of acquisition of such property and taxed on such valuation. The value fixed on such property at each appraisal thereafter shall be the same per acre as the value fixed on similar property in the town or city.

Id. This language indicates that subsequent appraisals are based on the current tax assessments of "similar property" in the City. As the court has ruled above, the property to be taxed includes the buildings on the land at the time of acquisition. Thus, if those buildings remain on the property after acquisition, "similar property" includes such buildings. If the buildings are razed, "similar property" will be lots without buildings. The parties seem to agree on these points.[30] They disagree,

---

[28] The court notes that any discussion here of the noise lots' valuation pursuant to section 3659 could be rendered moot if such property is found at trial to have been acquired in conformance with 5 V.S.A. §§ 751–753. In that event, all of the noise lots could be taxed pursuant to section 754. See Ex. CC.

[29] As noted above, the City has apparently taken inconsistent positions on this issue. The court takes its later filing as its current position.

[30] The City correctly points out that when it enacted section 3659, "the legislature likely never envisioned a municipality buying property . . . just to tear down the preexisting improvements out of concern for airport noise and replacing those improvements with green space." South Burlington's Opp'n at 7. However, that does not mean the court can choose to disregard the statute. If the current value of the property is lower now than when it was purchased, the statute mandates that the lower value controls for taxation purposes under section 3659.

however, over whether the vacant land should be considered similar to open lots that have future residential development potential, or as open lots that are usable only for commercial/industrial/transportation.

The City argues that those lots cannot be treated as "airport," "airport industrial," or "industrial, commercial, or transportation development" for appraisal purposes under a highest and best use analysis. Rather, they must be valued as residential property, because that is their only legally permissible use under the applicable zoning regulations, there is no evidence of a prospective zoning change from "residential" to "airport," and the FAA grant assurances and regulations cited by Taxpayer actually allow residential use of the noise lots. Taxpayer argues that the lots must be valued as commercial/industrial/transportation development land because they will never again be used for residences.[31]

In assessing real property for taxation purposes, "properties must be listed at fair market value." Lathrop v. Town of Monkton, 2014 VT 9, ¶ 10, 195 Vt. 564. The statute defines fair market value as:

> the price that the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value. Those elements shall include the effect of any State or local law or regulation affecting the use of land, . . . and any local or regional zoning ordinances or development plans. In determining estimated

---

Further, it is unclear whether the values in the City's grand list for 2012, 2013, and 2014 reflect "the value fixed in the appraisal next preceding the date of acquisition of such property" or "[t]he value fixed on such property at each appraisal thereafter [which] shall be the same per acre as the value fixed on similar property in the town or city." 32 V.S.A. § 3659. This would necessarily depend on when the residential properties were acquired by the airport. The statute makes clear that the City cannot rely on the pre-acquisition appraisal value years after acquisition.

[31] Taxpayer also argues that, even assuming the noise lots are to be assessed as residential, the City has submitted inadequate evidence of the noise lots' value. Although evidence of value must be based on similar property in South Burlington other than the noise lots or other property owned by the airport, such evidence apparently exists in the record. See Ex. 14A at 24, 25, 27, 29, 31; 15A at 38 (Navin appraisals).

> fair market value, the sale price of the property in question is one element to consider, but is not solely determinative.

32 V.S.A. § 3481(1). Fair market value is based on the highest and best use of the property. Lathrop, 2014 VT 9, ¶ 10 (citing Zurn v. City of St. Albans, 2009 VT 85, ¶ 8, 186 Vt. 575 (mem.)). "The highest and best use of property has generally been construed to refer to 'the value of the property for its most profitable, likely, and legal use.'" Scott Const., Inc. v. City of Newport Bd. of Civil Auth., 165 Vt. 232, 235 (1996) (quoting D. Stockford, Property Tax Assessment of Conservation Easements, 17 B.C. Envtl. Aff. L. Rev. 823, 827 (1990)). Thus, fair market value "accounts for the property's availability, use, and other elements which combine to give the property a market value" and, "[a]lthough this may include consideration of intangibles associated with the realty, such as zoning, permits, and licenses, . . . the mere existence of uncertainty in the regulatory process does not bar consideration of development potential. Zurn, 2009 VT 85, ¶ 8 (internal quotations omitted).

Taxpayer's appraiser, George Silver, treats the noise lots as part of the main airport parcel in his appraisal, and values them at the same rate per acre as the main parcel, as "industrial, commercial, or transportation development" rather than "residential."[32] Taxpayer also points to

---

[32] Raising collateral estoppel, Taxpayer claims the noise lots cannot be used for residential purposes, citing In re Burlington Airport Permit, where the Supreme Court stated: "Once BTV has acquired a home under the NCP and the sellers have relocated, the home is left vacant and cannot be permanently reoccupied on the current premises for residential purposes." 2014 VT 72, ¶ 3, 197 Vt. 203.

Taxpayer's attempt to use issue preclusion based on Burlington Airport Permit is unpersuasive. Potential use of the noise lots was not actually litigated and decided by the Environmental Court. Instead, inability to permanently reoccupy for residential purposes was apparently an undisputed fact recited by the Supreme Court from the Environmental Court decision. See id. ¶ 3; Decision on Cross Motions for Summary Judgment, Burlington Airport Permit, No. 93-7-12 Vtec, 2013 WL 4404685, *1 (Vt. Super. Ct. Mar. 20, 2013) (Durkin, J.); see also Scott v. City of Newport, 2004 VT 64, ¶ 8, 177 Vt. 491 ("Collateral estoppel, or issue preclusion, bars the subsequent relitigation of an issue that was actually litigated and decided in a prior case where that issue was necessary to the resolution of the dispute."). It is also unlikely the City had a full and fair opportunity to litigate the issue in that case, as it involved a permit application for structure demolition, rather than anything related to municipal taxation. See Trepanier, 155 Vt. at 265. Moreover, the issue in that case—whether demolition of vacant houses and filling of cellar holes was a change in use requiring site plan review—is different from the issue here: whether future reoccupation for residential purposes

the fact that, before being instructed by counsel to use a different approach, South Burlington appraiser Michael Hodges' included the noise lots with his valuation of the "airport"/"airport industrial" property in "Area 1." *See* Ex. B at 21. Hodges stated in pertinent part:

> Area 1 is the main Airport site, which consists of the airfield area, to include terminal, and aircraft/passenger support areas, the Vermont Army Guard and Vermont Air National Guard developments, as well as all of the individual parcels acquired as part of the Noise Compatibility Program (NCP). . . . [T]he inclusion of the NCP parcels into the total land area comprising Area 1 is deemed to best reflect the contributory value of various complementary areas of airport developments. Due to various setbacks, open space requirements, ingress/egress areas, and land areas utilized as buffer zones or for future expansion, areas such as the NCP parcels at BTV are typically found at all publicly owned and operated airports. Airports are constantly evolving enterprises that must constantly adapt to changes in technology, regulatory modifications, community concerns, etc. As such, most are continuously acquiring surrounding properties for noise mitigation/buffer zones, safety areas, or economic development. These areas are generally incorporated into the airport parcel and redeveloped as necessary. While the current zoning for these parcels is R-4, it is deemed likely that the zoning will be modified in the future to Airport, Mixed Industrial and Commercial, and/or Airport Industrial zoning to be consistent with the surrounding Airport environs.

Ex. B (Michael A. Hodges, Appraisal of Retrospective Market Value of the Underlying Land: Burlington International Airport Development, dated Mar. 11, 2014) at 21. Hodges later assessed the noise lots as residential, as instructed by South Burlington's attorneys. *See* Burlington's SMF ¶¶ 27–28; South Burlington's Resp. ¶ 27. The fact that Hodges changed his methodology at the instruction of the City's attorneys goes to the weight of his testimony at trial. It does not bind the City to his initial position. His original report certainly provides evidence that a zoning change to the noise lot land is likely at some point in the future.

---

is prohibited. Burlington Airport Permit, 2014 VT 72, ¶ 8; *see also* Trepanier v. Getting Organized, Inc., 155 Vt. 259, 265 (1990).

These lots in all likelihood will not be occupied as residential property in the foreseeable future. They are being utilized as a "green space" noise buffer for the airport. Although reoccupation as residential property is not strictly prohibited by federal regulations and the FAA grant assurances, such a use is so remote as to be practically prohibited. Taxpayer has submitted evidence that the airport would have to pay back millions of dollars in federal grants if it reversed its noise compatibility program. *See* Ex. KK (Aff. of Robert McEwing) ¶ 11. Although a residential use is permitted under the grant assurances provided the buildings are insulated to comply with certain noise levels, the fact is that the current NCP plan is demolition of the residences for the establishment of green space, rather than reinsulating the structures. The record is not clear as to the exact costs and efforts required to transition from the current plan to a redevelopment and insulation plan, but at this point all of the structures have been demolished. *See* Affidavit of Gene Richards ¶ 3 (attached to Burlington's Resp. to South Burlington's Supplement, filed Oct. 19, 2015).[33]

A determination of highest and best use considers "the value of the property for its most profitable, likely, and legal use." Scott Const., 165 Vt. at 235. Although the "mere existence of uncertainty in the regulatory process does not bar consideration of development potential," Zurn, 2009 VT 85, ¶ 8, future use of the property as a residential development is not likely. While the City claims that any use of residentially zoned property other than that specifically enumerated under the zoning regulations is legally impermissible, it is clear that the noise lots' current use as airport green space is not illegal. In fact, that use has been implicitly approved by the City through

---

[33] All of the structures had not been demolished, however, at the beginning of this appeal process, due to an individual's appeal of the issuance of removal permits by the City. *See* Affidavit of Gene Richards ¶ 3 (attached to Burlington's Resp. to South Burlington's Supplement, filed Oct. 19, 2015).

its granting of demolition permits for the properties. *See* Ex. KK (Aff. of Robert McEwing) ¶¶ 14–15.

The Supreme Court aptly described the noise lots in its recent decision as currently existing in "land-use limbo," noting that "these structures lack any practical utility at present and that the underlying lots are used only as empty space." Burlington Airport Permit, 2014 VT 72, ¶ 17. Though it is obvious that the lots will not be used again for residential purposes, such a use is legally permissible. It is equally clear that the lots cannot be used as "industrial, commercial, or transportation development" property under the existing "residential" zoning regulations, and Silver's report indicates that no evidence of plans to change the zoning currently exist, yet the lots currently function as an empty "green space" noise buffer zone next to the airport.

The bottom line here is that there are competing expert opinions on each side with differing views of what constitutes "similar" property. Taxpayer's expert opines that the highest and best use of the noise lots is as "industrial, commercial, or transportation development." The City's expert opines that the highest and best use is as "residential." The court is not persuaded that either

opinion is inadmissible or entirely unsupported.[34]  Therefore, the valuation of the noise lots is disputed, and the matter is appropriate for trial.[35]

## VI.  "Subdivision" or "Partition" of Parcels for Appraisal Purposes

Taxpayer contends that the City impermissibly "subdivided" or "partitioned" the airport property in its valuation. However, as the court has ruled above in the context of determining "public use," it is not error for a taxing authority to partition property for appraisal purposes. *See* pp. 31–32, supra, *see also* Lathrop v. Town of Monkton, 2014 VT 9, ¶ 10, 195 Vt. 564 ("The Town is not required to treat an undivided parcel as one economic unit for appraisal purposes if the highest and best use of the property is as subdivided lots. . . . The development potential of property is an appropriate factor to consider in fixing appraised values.").

Taxpayer argues, however, that here the airport property must be assessed as a single, undivided whole, citing 32 V.S.A. § 4152(a)(3). That statute provides:

---

[34] The City argues that Taxpayer's expert opinion on value must be excluded.  The City offers several grounds for exclusion of the Silver appraisal: (1) he provides no evidence of value of "similar property" in the City; (2) by valuing the lots as raw undeveloped acres without considering the improvements, he fails to comply with the section 3659 statutory scheme; (3) he does not separately account for the noise lots, instead grouping them into one area; (4) his highest and best use analysis is invalid because it fails to account for a legal impermissibility; and (5) he makes an erroneous assumption that the FAA grant assurances amount to an encumbrance with no evidence of how it has affected sale prices.

Based upon the court's rulings elsewhere in this decision, the court rejects all of these arguments except the second. With regard to acquisition years, by not valuing the pre-existing improvements, Silver did not comply with section 3659's requirement to value the land and preexisting improvements in the year of acquisition. (The record suggests that some properties were acquired in 2012 and 2013, although many predated the years at issue here. *See* Ex. CC.) Silver's appraisal offers no evidence of value as to the improvements. However, this does not justify excluding him as a witness at trial. It merely limits his ability to testify on that one issue.

To the extent that the court's rulings above affect either side's appraisal, portions of each may be inadmissible or invalid at trial. The weight of each appraisal, and whether portions are inadmissible, will be determined at trial.

[35] Taxpayer also argues that the value of the noise lots must be reduced from what it paid to acquire the lots because of their close proximity to the noise-generating airport. The City moves to exclude the Silver affidavit supporting Taxpayer's argument here because Taxpayer previously admitted that it paid fair market value for the noise lots. The City also claims that any reduction in value due to airport noise was already taken into account because the noise has been there for many years. To the extent that the Silver affidavit (Ex. DD) and appraisals imply that because of airport noise the lots are worth less than what Taxpayer actually paid, Silver's affidavit is admissible. Its weight will be determined by the court at trial.

> When completed, the grand list of a town shall be in such form as the Director prescribes and shall contain such information as the Director prescribes, including:
>
> . . .
>
> A brief description of each parcel of taxable real estate in the town. "Parcel" means all contiguous land in the same ownership, together with all improvements thereon[.]

This section, however, does not appear to have any bearing on valuation as separate parcels or as one tract. It simply directs towns procedurally how to list property within a grand list. In re Beliveau, No. 2009-399, 2010 WL 1266683, at *1 (Vt. Apr. 1, 2010) does not indicate otherwise. That case involved a taxpayer who did not challenge the assessed value of his property, "only the mere fact that both lots are listed as one parcel on the grand list." Id. at *1.[36] The grand list must also include "[t]he listed valuation of each parcel which is not exempt." 32 V.S.A. § 4152(a)(5). Assuming the same definition of parcel applies in that sub-subsection, it still does not mandate anything beyond a particular method of *listing* each parcel.[37]

In re Spectrum Arena, Inc. is similarly inapposite. That case held that the articulated distinctions between two different stadiums located within the City of Philadelphia "as to the public purposes they serve are distinctions without differences and are not legally justifiable." 330 F. Supp. 125, 128 (E.D. Pa. 1971). While that might have been true in that particular case, Spectrum does not stand for the proposition that all properties everywhere must be treated as a

---

[36] Indeed, the Supreme Court seemed perplexed by the taxpayer's argument, and noted in dicta:

> As an initial matter, it is difficult to discern how taxpayer has suffered any cognizable injury, and therefore, how he has standing to pursue this claim. He does not challenge the assessed value of his property, only the mere fact that both lots are listed as one parcel on the grand list. What harm has he suffered as a result of the Town's action?

In re Beliveau, No. 2009-399, 2010 WL 1266683, at *1 (Vt. Apr. 1, 2010).

[37] As noted above, the court is also unpersuaded by the Burlington City Charter definition of "airport." Taxpayer does not point to anything suggesting that this general definition is binding in the context of tax valuation.

58

unitary, undivided whole for tax valuation purposes. Rather, "[t]estimony as to the value of property if subdivided is generally admissible on the issue of fair market value as evidence of the highest and best use of that land." Scott Const., 165 Vt. at 238 (citing Tolman v. Carrick, 136 Vt. 188, 192 (1978)).

The court notes, however, that although partitioning a property for appraisal purposes is generally legally permissible, it is a factual question whether the highest and best use of the property is, in fact, as subdivided lots, or as a single, unitary whole. Indeed, "'[t]here is no hard and fast rule that can be applied universally to guide assessors in determining whether parcels of land are to be assessed separately or together. . . . [N]o single factor is decisive of the issue.'" Fearon v. Town of Amherst, 116 N.H. 392, 393–94 (1976) (quoting Town of Lenox v. Oglesby, 311 Mass. 269, 271 (1942)); see also Neun v. Town of Roxbury, 150 Vt. 242, 243–44 (1988) ("All relevant factors must be considered in determining whether or not property should be assessed as a single parcel, including whether the property was conveyed in one deed, the character of the land and the purposes for which it is used, whether separately deeded tracts are contiguous, and whether the property currently functions as one tract for the owner."); Vanderminden v. Town of Wells, 2013 VT 49, ¶ 12, 194 Vt. 96.[38] Here, because there is expert testimony that genuinely disputes whether the highest and best use is as subdivided lots or as a unitary whole, the issue is appropriate for trial.

## VII.    Other Non-Residential Real Estate

The City moves for summary judgment as to the value of eight parcels, which are listed on page 39 of its motion for partial summary judgment. The City contends that those properties are

---

[38] The court disagrees with Taxpayer's claim that the Neun multi-factored test as to whether multiple parcels must be *valued* together or separately was superseded by statute as implied by In re Beliveau, No. 2009-399, 2010 WL 1266683. That is a different issue than how parcels must be *listed*.

not subject to sections 3659 or 754, that the only potential issue is whether the grand list value is correct, and that Taxpayer has submitted no evidence of value as to those properties. Taxpayer seemingly responds to this argument on page 22 of its opposition, claiming only that the City bears the burden of proof and must put forth evidence demonstrating the validity of its assessed values. As there is no evidence in the record that these particular properties are put to a public use, they are not subject to a presumption of non-taxability, and so neither section 3659 nor section 754 can apply. Thus, Taxpayer has the burden to submit evidence of value as to those properties if it in fact contests the grand list value. *See* New England Power, 134 Vt. at 507. Because it has not done so, summary judgment is granted for the City as to those eight parcels.

VIII.     <u>Immunity or Exemption from Statewide Education Property Tax</u>

Vermont has a two-tiered property taxation system where a municipality collects a statewide education property tax on behalf of the State, as well as local taxes which go to the municipality. The City argues that there is no immunity or exemption from the statewide education property tax, so at most, Taxpayer's arguments pertain only to the local portion of property taxes assessed and collected by the City.

The statewide education tax is imposed on "all nonresidential and homestead property." 32 V.S.A. § 5402(a). "Nonresidential property" is defined to include "all property," but there are certain listed exceptions. Id. § 5401(10). Those exceptions include "[p]roperty which is exempt from the municipal property tax by law and not by vote of the municipality." Id. § 5401(10)(A).[39]

---

[39] There is also an exception for "[p]roperty owned by a municipality which is located within the municipality and which is used for municipal purposes including the provision of utility services." 32 V.S.A. § 5401(10)(F). However, by its express terms, it does not exclude municipally owned property which is located *outside* that municipality from the statewide education property tax.

Here, if Taxpayer succeeds at trial in its arguments that the property is subject to the special taxation rules of section 3659, it is still subject to taxation, albeit at special rates. That would therefore not trigger the "exemption" language of Title 32. However, if Taxpayer succeeds on its claims that section 754 applies, it does expressly state that the property "is not taxable." It would therefore be exempt under Title 32. Thus, the resolution of this issue must await trial.

Order

The parties' motions for partial summary judgment are granted in part and denied in part, in accordance with the decision above:

I.     The burdens of proof for the various parts of this appeal will be utilized at trial as articulated in Section I above.

II.    Summary judgment is granted for Taxpayer as to the general rule of construction for municipal taxation statutes, as discussed in Section II above.

III.   Summary judgment is granted for the City on the issue of whether the pertinent statutes contain a public use requirement.

IV.    As to whether four particular private leaseholds on the airport are primarily devoted to a public use, summary judgment is granted for the City as to 73 Customs Drive and 1150 Airport Drive, and those locations are subject to taxation at full market value. Summary judgment is denied as to 15 Eagle Drive and 1120 Airport Drive, and the use of those locations will be determined at trial.

V.     As to the noise lots:

       A.  Specifically as to 5 V.S.A. §§751–754:

i. Summary judgment is granted for Taxpayer as to whether 130.2 acres of land were purchased in conformity with sections 751–753, although which parcels make up that 130.2 acres will be determined at trial;

ii. Summary judgment is granted for Taxpayer as to the legal question of whether land purchased in part with federal funds may be subject to section 754, although the factual questions of which land and how it was financed will be determined at trial;

iii. Summary judgment is granted for Taxpayer as to the construction of section 754. As discussed in Section V above, for lands covered by section 754, the payments in lieu of taxes are based on the value of the land alone and the improvements are not taxed;

B. Summary judgment is denied to both parties regarding the construction of 32 V.S.A. § 3659. The court holds that the statute unambiguously taxes the land and any preexisting improvements at the then assessed value for the acquisition years, and as "similar property" for later years (but with a limit on the taxation of any post-acquisition improvements. See Section V above. However, because there are disputes of fact over what constitutes "similar" property, including whether the property should be treated as residential or commercial/industrial/transportation, summary judgment is denied on that issue;

VI. As discussed in Section, although it is not legally impermissible to subdivide or partition property for appraisal purposes, this presents a factual question which is appropriate for trial;

VII.    Summary judgment is granted for the City as to the eight parcels of real estate discussed in Section VII above; and

VIII.   Summary judgment is denied as to the Statewide Education Property tax, as that issue must await trial for resolution.

The clerk will schedule a status conference to discuss trial scheduling, and what appears to be (buried in the briefs) a request by the City for additional time to conduct discovery. As the parties do not disagree on the City conducting some such discovery, it should begin now rather than awaiting the conference.

Dated at Burlington this 3rd day of March, 2016.

_____
Helen M. Toor
Superior Court Judge